3 P.3d 1142

AIDA RENTA TRUST: AKT Joint Venture; Alchemedes Boulder Creek Limited Partnership; Alta Place Arizona Limited Partnership; Alta Vista Apartments; American First Tax Exempt Mortgage Fund 2 L.P.; Amigon Strategic Investments; Anancosta Apartments, Inc.; Anasazi Terrace Condominiums, U.S. Limited Partnership; Arabian Trails Development Partners; Aram II Investment Company; Arboleda Investment, L.L.C.; Arthur G. Grandlich; Autumn Creek Property Associates, Limited Partnership; AZ Development Partners, a Massachusetts limited partnership; Barnar Associates; Bethany Apartments Limited Partnership; Bigelow Arizona Casa Carranza Limited Liability Company; Bigelow Arizona Corporation; Bigelow Arizona Limited Liability Company; Bigelow Arizona Limited Liability Company II; Bigelow Arizona Limited Liability Company III; BLM LLC; BRE Properties, Inc.; Bruce J. & Shelagh M. Cann Trust; C & LI, L.C.; Canbrook Limited Partnership; Casa Bonita Investments Limited Liability Company; Casabella Associates, an Arizona joint venture partnership; Cedar Meadows, Inc.; Christian Relief Services, an Arizona affordable housing corporation; Cigna Income Realty–I Limited Partnership; Cluster Housing Properties, a California limited partnership; Concord Equities Limited Liability Company; Contessa Investments Limited Liability Company; Country Villas Limited Partnership; CPW Properties Limited Partnership; Creekwood Summit Lake Limited Partners; CS Apartments, L.L.C.; David A. and Patricia M. Alderdice; Del Mar Terrace Apartments; Desert Pines

Investment Associates; Dozier, Preissman; El Dorado Arms, Inc.; Empire Partners, L.L.C.; EQR Arizona, L.L.C.; EQR–Bethany Village Vistas, Inc.; EQR–Camellero Vistas, Inc.; ERP Operating Limited Partnership; Evans Withycombe Finance Partnership; Farmstead Mesa Property, L.P.; First Interstate Bank of Arizona Trust; Foothills Shadows Associates Limited Partnership; Frank Lane Italiane; FSA II Hacienda Verde Associates; FSF Quail Point Associates; Gasser Revocable Living Trust & Maxine Gasser Decendent Trust; Good Fellow, Inc.; H & H Enterprises; Hacienda Properties, L.P.; Hamilton Agnew Mather Trust; Hayden Place, L.L.C.; HEF Development, Inc.; Jacques H. and Frances M. Robinson; James T. Szymanski and Mary Ann Szymanski; James Eugene Albert; James G. Boswell Living Trust; JMB Institutional Apartment Limited Partnership; John Henry and Brigid R. Ragland, Cotrustees of The Ragland Revocable Trust; Josam Investment Company; Joshua Tree, a Washington limited partnership; JPI Partners Limited Partnership; La Corrida Apartments Limited Partnership; La Serena Partners I Limited Partnership; Lakeside Village Apartments, L.P.; Lakme Partnership; Las Brisas Associates; Lawrence B. and Geraldine S. Miller; Lincoln Arizona Associates; Lincoln Broadway Village Limited; Los Verdes, L.L.C.; Luke Park Development; Luke Park Development Phase II; Magellan Dobson Springs Limited Partnership; Magellan Emparrado Limited Partnership; Magellan Las Palmas Limited Partnership; Marques Properties, L.L.C.; Maurice Teitelbaum; Meadow Glen Limited Partnership; Melvyn L. & Laraine S. Marcus; Mesa Hidden Village; Mirada Development Corp.; Mountain Vista Partnership; Northern Green Associates; Olive Square Limited Partnership; Orangetree, Inc.; Osage, L.L.C.; Papago Vista Apartments Limited Partnership; Paradise Trails Associates; Parklane Associates, L.P.; Paul V. and Angeline A. Baker; Pebble Creek/Mesa Limited Liability Company; Phoenix Crossroads Apartments Limited; Pimesa Property, L.P.; Pinnacle Holdings, Inc.; Place II Properties; Presidio Joint Venture; Property Trust of America; Quail Holdings, L.L.C.; Residential Property Investors, L.P.; Richard B. and Susan M. Darby; Richard N. Mills; Robert S. and Karen Walker Trust/Gerald R. Neva; Ronald Tate Trust; Roscrea Associates Limited Partnership; Salado Springs Association Limited Partnership; Santa Fe & El Segundo; Scottsdale Foothills Limited Partnership; Scottsdale Park Terrace; Security Capital Pacific Trust Shadow Creek Limited Partnership; Shadow Run Apartments, Inc.; Siegfried C. Ringwald or Mesa Summit, Inc.; Sofistar Limited Partnership; Sun Lakes Marketing Limited Partnership; Sunscape Apartments, a California limited partnership; Sunset Shadows Apartments Limited Partnership; Sycamore Properties, L.L.C.; The Al Angelo Co.; The Damm Partnership; The Nadler Company; Theodore T. and Marie Smith; Thunderbird Gardens Resort, L.L.C.; Toltec Apartments; Towne Center Limited Partnership, a Washington limited partnership; Unum Life Insurance Company of America; Vecwest Tatum Limited Partnership; Village at North Park Associates; Villages Apartments, Inc.; Vista Del Lagos Joint Venture; Wellsford Residential Property Trust; Westside Apartments Limited Partnership; William A. Mead Trust; YF Partners Eastridge Limited Partners; YF Partners La Estancia Limited Partnership; YF Partners, Rancho Sierra Limited Partnership; 324 South Horne Street Associates, L.P.; 777 Investments, Inc., Plaintiffs–Appellees,

v.

The DEPARTMENT OF REVENUE OF the STATE OF ARIZONA and Maricopa County, Defendants–Appellants.

Nos. 1 CA–CV 98–0389, 1 CA–CV 98–0390.

Court of Appeals of Arizona,
Division 1, Department T.

Feb. 1, 2000.

Helm & Kyle, Ltd. by John D. Helm, Roberta S. Livesay, Thomas A. Walcott, Special Counsel, Tempe, for Defendant–Appellant, Maricopa County.

Janet A. Napolitano, Arizona Attorney General by Frank Boucek, III, Assistant Attorney General, Phoenix, for Defendants–Appellants.

Nearhood Law Offices, PLC by Richard D. Nearhood, James R. Nearhood, Scottsdale, for Plaintiffs–Appellees.

## OPINION

PATTERSON, Judge.

¶ 1 This appeal addresses two issues:

1. Whether Arizona law imposes a "jurisdictional" requirement that a taxpayer pay "under protest" a tax alleged to have been illegally collected before the taxpayer may maintain an action under Arizona Revised Statutes Annotated (A.R.S.) sections 42–11004 and 42–11005 (1998 Special Pamphlet)[1] to recover the tax, and

2. Whether a taxing authority violates the Equal Protection Clause[2] of the United States Constitution or the Uniformity Clause[3] of the Arizona Constitution by making full and unconditional payment of one taxpayer group's refund claims in settlement of a refund action while at the same time contesting the refund claims of a similarly situated taxpayer group in a separate action based on the same legal theory.

We present only as much detail about the facts of these three consolidated cases as is necessary to understand the legal issues.

### PERTINENT FACTS AND PROCEDURE BELOW

¶ 2 The taxpayers are apartment building owners and managers who brought three actions for refunds of ad valorem taxes they alleged were imposed and collected on illegally determined real property valuations. In an earlier action, Maricopa County Superior Court Cause No. CV 95–12688, the (Evans–Withycombe case), three other apartment building owners also represented by the taxpayer-appellees' counsel sought refunds of ad valorem taxes for the same tax year on a theory of recovery identical to that asserted by the taxpayer-appellees here. In the Evans–Withycombe case, Maricopa County (the

---

1. Formerly A.R.S. section 42–204(A) and (C) (Supp.1998); renumbered effective January 1, 1999. For the reader's convenience and future application of this opinion, we use the current designation of Arizona taxing statutes throughout.

2. The clause provides in pertinent part: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

3. The clause provides in pertinent part: "All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax...." Ariz. Const. art. 9, § 1.

County) settled with the three plaintiffs through an agreement that granted all the relief they had requested, including revaluation of their properties in accordance with their theory of recovery and refunds of the taxes they claimed to have overpaid.

¶ 3 By contrast, the County and the Arizona Department of Revenue (ADOR) actively opposed the taxpayers' claims for relief in the instant litigation. The County moved for summary judgment on the theory that the trial court lacked "jurisdiction" to entertain the taxpayers' refund action under A.R.S. sections 42–11004 and 42–11005. The taxpayers moved for summary judgment on the theory that the doctrine of virtual representation precluded the County and ADOR from opposing their refund claims after having entered into a consent judgment granting other taxpayers relief on legally identical claims. The taxpayers' motion also contended that in view of the earlier settlement agreement, the County's and ADOR's refusal to accede to the taxpayers' demands for relief in this case constituted discrimination in violation of the taxpayers' rights under the Equal Protection Clause of the United States Constitution and the Uniformity Clause of the Arizona Constitution. *See* U.S. Const. amend. XIV, § 1; *see also* Ariz. Const. art. 9, § 1.

¶ 4 The trial court granted the taxpayers' motion for summary judgment and denied the County's. Concerning the County's motion for summary judgment, the trial court reasoned:

> There is no statutory authority to support the County's position that Plaintiffs' failed to preserve their claim by paying their taxes under protest. Neither A.R.S. § 42–204 nor any other section of the Tax Code requires that **property** taxes must be paid "under protest" in order to preserve a claim of an illegal assessment. There is no Arizona opinion which has held that a taxpayer's claims under A.R.S. § 42–204 should be dismissed under a common law theory for failure to pay property taxes under protest.

In granting the taxpayers' motion for summary judgment, the trial court reasoned:

Both Evans–Withycombe and these Plaintiffs filed complaints against the Defendants. The claims of these two Plaintiffs were almost identical. The only differences between the two lawsuits were the identity of parcels, and the amount of refund alleged to be due the parties. The underlying causes of action and the relief requested were identical.

The Defendants agreed to honor the identical claims made by the Evans–Withycombe Plaintiffs and agreed to the entry of a judgment for the full relief requested in the amended complaint filed by Evans–Withycombe. That judgment was entered in January 1997. The Defendants now refuse to honor the same claims made by these Plaintiffs.

. . . .

The only distinctions between the Evans–Withycombe taxpayers, and the taxpayers in this appeal, are the identity of parcels, the number of taxpayers, and the size of the total refund. These distinctions have no constitutional import.

The decision to honor only the *Evans–Withycombe* claims constitutes discrimination in favor of the taxpayers in Evans–Withycombe and against the only other group of taxpayers that could have been affected by this decision, the taxpaying Plaintiffs in this case.

This Court does not hold that "taxing authorities can never settle a case without having to give the exact same treatment to all other taxpayers **regardless of the circumstances.**" Defendants' response at 8. Rather, this Court holds that where the County has two taxpayer groups with identical claims before it at the same time, and under the identical circumstances, the County cannot honor the claims of one group and deny the claims of the other group without creating impermissible discrimination in violation of the United States and Arizona constitutions.

The trial court entered formal judgment in accordance with its ruling and later denied

the County's motion for new trial. ADOR and the County timely appealed.[4]

## ANALYSIS OF DISPOSITIVE ISSUES

### "Under Protest"

¶ 5 The County urges that in addition to the express requirement under A.R.S. sections 42–11004 and 42–11005 and their predecessors that the plaintiff pay all the taxes "[w]hich are the subject of the action ... prior to becoming delinquent," Arizona courts have consistently ruled that the plaintiff must do so "under [written] protest." The County contends that the trial court lacked "jurisdiction" in these consolidated actions because, as all parties apparently agree, none of the taxpayers paid "under protest" any of the taxes they challenge as illegally assessed.

¶ 6 The most recent Arizona decision on which the County relies is *Department of Property Valuation v. Salt River Project Agricultural Improvement & Power District*, 27 Ariz.App. 110, 115, 551 P.2d 559, 564 (1976), *vac'd in part on other grounds and remanded*, 113 Ariz. 472, 556 P.2d 1134 (1976). There we stated:

A wholly separate method of contesting tax liability is the payment of the taxes due under protest and a suit for refund of those taxes contended by the taxpayer to be "illegally collected." A.R.S. § 42–204(C). The utilization of this method has two prerequisites: (1) the taxes must be due ...; and (2) the taxpayer must pay these taxes "under protest." *Maricopa County v. Arizona Citrus Land Co.*, 55 Ariz. 234, 100 P.2d 587 (1940).

*Accord* 113 Ariz. at 473, 556 P.2d at 1135 (quoting *Maricopa County v. Chatwin*, 17 Ariz.App. 576, 582, 499 P.2d 190, 196 (1972)).

¶ 7 The rationale for the extra-statutory requirement of payment under protest is traceable to the Territorial Supreme Court's decision in *Gibson Abstract Co. v. Cochise County*, 12 Ariz. 158, 100 P. 453 (1909). There the taxpayer paid 1907 personal prop-

erty taxes at $2.65 per $100, the rate that had been set for tax year 1906. *See id.* at 159, 100 P. at 453. The Board of Supervisors thereafter set the 1907 rate at $2 per $100. *See id.* The taxpayer brought an action for a refund. Because the taxpayer had paid the taxes voluntarily and without protest, the ·district court sustained Cochise County's general demurrer to its complaint. *See id.* Affirming, the Territorial Supreme Court stated:

If ... the appellant and its assignors had given bond, they could have had the benefit of the rate for the current year, instead of paying on the rate of the previous year. The cost and additional emoluments going to the assessor are given as a reason why they did not do so; but, if that law is valid, it is a hardship imposed upon them by that law, and, our duties not being those of legislation, they cannot be relieved in this court from the compliance with a valid law, however drastic. If the enforcement of that law would be in violation of their rights as accorded them by the constitution, and it was therefore null and void, they cannot expect relief from a payment made by them without protest, even if induced by a threat to inflict upon them the penalties of a void law, because the party threatening would, by reason of the invalidity of the law, be powerless to execute such threat.

12 Ariz. at 161, 100 P. at 454.

¶ 8 The Supreme Court of the new State of Arizona first adopted the payment-under-protest rule in 1919. *See Arizona Eastern Railroad Co. v. Graham County*, 20 Ariz. 257, 179 P. 959 (1919). The court held that a person who had paid an illegal tax under protest need not also present a verified demand for refund to the Board of Supervisors within six months as a condition precedent to bringing suit. *See id.* at 258, 179 P. at 959. In the course of its discussion, the court stated concerning the predecessor of A.R.S. sections 42–11004 and 42–11005 [5]:

---

4. We have appellate jurisdiction under A.R.S. section 12–2101(B) and (F)(1) (1994). This appeal is assigned to Department T of this court as required by A.R.S. sections 12–120.04(G) (Supp. 1998) and 12–170(C) (1992).

5. Revised Statutes of Arizona 1913, Civil Code, § 4939.

This statute does not expressly require the taxpayer to protest at the time of his payment as a condition precedent to the maintenance of his action under said paragraph 4939, but, in order to remove such payments of taxes from the category of voluntary payments to the county, the taxpayer must, in some manner, unequivocally make known his purpose of paying the excess is to permit him to contest the legality of the excess in court. Otherwise his payment would be deemed voluntary, and no recovery could be had against the county. *Gibson Abstract Co. v. Cochise County,* 12 Ariz. 158, 100 P. 453.

*Id.* at 259, 179 P. at 960; *accord Maricopa County v. Arizona Citrus Land Co.,* 55 Ariz. 234, 236, 100 P.2d 587, 588 (1940); *Pima County v. Weddle,* 54 Ariz. 525, 529, 97 P.2d 531, 532 (1939).

■ ¶ 9 Although more recent decisions of the supreme court and this court since *Arizona Citrus Land* have alluded to the payment-under-protest requirement for A.R.S. section 42–11004 actions, none has actually applied any such requirement to turn away any taxpayer's refund action under that statute. *See State Comp. Fund v. Symington,* 174 Ariz. 188, 192, 848 P.2d 273, 277 (1993); *Salt River Project,* 113 Ariz. at 473–74, 556 P.2d at 1135–36; *State Tax Comm'n v. Superior Ct. (Maricopa County),* 104 Ariz. 166, 168, 450 P.2d 103, 105 (1969); *Tucson Elec. Power Co. v. Apache County,* 185 Ariz. 5, 19, 912 P.2d 9, 23 (App.1995). Moreover, a frequently cited decision of our supreme court implicitly dispels any notion that the common law payment-under-protest requirement may constitute a prerequisite to the superior court's "jurisdiction" in tax refund actions, and indeed casts significant doubt on the continued viability of the payment-under-protest rule for any purpose. *See Pittsburgh & Midway Coal Mining Co. v. Arizona Department of Revenue,* 161 Ariz. 135, 776 P.2d 1061 (1989).

¶ 10 *Pittsburgh* concerned state use taxes and transaction privilege taxes, both of which formerly included express provisions conditioning refund actions on payment of taxes "under protest." *See* former A.R.S. §§ 42–1339(B) and 42–1421(B) (1980).[6] In *Pittsburgh,* the taxpayers paid use taxes and transaction privilege taxes to ADOR without protest, believing at the time that no grounds for dispute existed. 161 Ariz. at 136, 776 P.2d at 1062. For each taxpayer, circumstances later arose that called this belief into serious question. *See id.* All taxpayers claimed refunds from ADOR. *See id.* Relying in part on former A.R.S. sections 42–1339(B) and 42–1421(B) and in part on the "general rule" that taxes voluntarily paid without protest cannot be recovered, ADOR denied their claims. *See id.* The taxpayers achieved varying degrees of success in their separate superior court refund actions. *See id.* In the supreme court, however, all prevailed. *See id.* at 140, 776 P.2d at 1066. The court interpreted the applicable statutes as functioning only within the administrative and judicial process for resolving actual disputes over tax liabilities. *See id.* at 138, 776 P.2d at 1064. The court held that outside that context, the statutory payment-under-protest requirements did not function as a condition precedent to the state's duty to refund taxes to which it was not entitled. *See id.* Of the common law payment-under-protest requirement on which the County relies in the instant case, the *Pittsburgh* court stated:

> Arizona concedes that there are exceptions to the general rule. For example, even though not paid "under protest," Arizona must refund taxes paid on obligations which are extinguished by prior payment. *Maricopa County v. Leppla,* 89 Ariz. 220, 223, 360 P.2d 227 (1961). And, relying on *Smotkin v. Peterson,* 73 Ariz. 1, 5, 236 P.2d 743 (1951), and *Bodco Building Corp. v. Arizona State Tax Commission,* 5 Ariz. App. 589, 591, 429 P.2d 476 (1967), Arizona concedes that it must refund taxes paid even when not marked "under protest" if at the time of the payment it had no "semblance of authority" to assess the tax.
>
> . . . .

6. Repealed by 1985 Ariz. Sess. Laws Ch. 366, § 1. *See* A.R.S. § 42–124(B)(2) (1991) (payment under protest requirement for tax court appeal eliminated by 1994 Ariz. Sess. Laws Ch. 375, § 2); A.R.S. § 42–124(D) (Supp.1998); A.R.S. § 42–1254(D) (1999).

We are of the view that these cases are to be decided by a comprehensive analysis of the relevant statutes rather than reliance on common law rules and exceptions which evolved in other contexts.

. . . .

· We acknowledge that *Swift & Company v. State Tax Commission,* 105 Ariz. 226, 233, 462 P.2d 775 (1969), is to the contrary. In reaching our conclusion in *Swift,* we relied on *City of Phoenix v. Phoenix Newspapers, Inc.,* 100 Ariz. 189, 412 P.2d 693 (1966). But *City of Phoenix* did not purport to examine the statutory schemes under which the use tax and the transaction privilege tax are imposed. Instead, the decision was based upon the rule at common law that a voluntary payment of taxes without protest and not under duress cannot be recovered by a taxpayer.

In *Swift,* we also sought to distinguish *Maricopa County v. Leppla,* 89 Ariz. 220, 360 P.2d 227 (1961). In *Leppla* we allowed the recovery of taxes voluntarily paid and not "under protest" notwithstanding our acknowledgement of the common law rule at issue. To reach our result, we characterized *Leppla* as a case in which a tax obligation did not exist after the original payment by the taxpayer. We do not think *Leppla* can be so easily distinguished. No tax obligation existed in *City of Phoenix,* and no tax obligation existed in *Swift & Company.* We think that neither *City of Phoenix* nor *Swift & Company* can survive a careful analysis of the relevant transaction privilege tax and use tax statutes. Thus, to the extent that *Swift & Company* and *City of Phoenix* suggest a contrary result, they are no longer to be followed. An honorable government would not keep taxes to which it is not entitled, and the legislative scheme supports that result.

161 Ariz. at 137, 139, 776 P.2d at 1063, 1065.

■ ¶ 11 We derive several principles from *Pittsburgh.* First, whatever the legal status of the common law payment-under-protest "requirement" for tax refund actions may otherwise be, it is plainly not "jurisdictional." As the *Pittsburgh* court noted, the "general rule" is subject to two exceptions.

161 Ariz. at 137, 776 P.2d at 1063. One of these exceptions, that the requirement does not operate when the tax obligation on which the taxpayer seeks a refund had already been paid, is based on facts that may be disputed and subject to resolution by trial. *See id.* The supreme court's recognition of this exception necessarily entails recognition that the superior court has jurisdiction to determine the facts on which the exception depends. The court has thus treated the "requirement" of payment under protest as one that may affect the availability of relief in a refund action, but not the superior court's jurisdiction to entertain it. *Cf. Hill v. City of Phoenix,* 193 Ariz. 570, 572, ¶ 8, 975 P.2d 700, 702 (1999) (cautioning against construing the concept of "jurisdiction" too narrowly).

¶ 12 Second, the supreme court's focus in *Pittsburgh* was solidly on the structure and intent of the governing statutes, not on the common law. 161 Ariz. at 138, 776 P.2d at 1064. Indeed, *Pittsburgh* criticized *Swift & Co.v. State Tax Commission,* 105 Ariz. 226, 462 P.2d 775 (1969), in large part because it had relied on *City of Phoenix v. Phoenix Newspapers, Inc.,* 100 Ariz. 189, 412 P.2d 693 (1966), which the *Pittsburgh* court said had based its rationale not on the statutes, but on "the rule at common law that a voluntary payment of taxes without protest and not under duress cannot be recovered by a taxpayer." 161 Ariz. at 139, 776 P.2d at 1065.

¶ 13 Neither *Swift & Co.* nor *City of Phoenix v. Phoenix Newspapers* survived *Pittsburgh* and the "rule at common law" also ended. *See id.*

¶ 14 To support its thesis that the payment-under-protest requirement continues to exist in property tax refund cases brought under A.R.S. sections 42–11004 and 42–11005, the County nevertheless relies on the following language from *Pittsburgh:*

> [A] tax must be paid "under protest" only when the payment is involuntary and part of a dispute between the taxpayer and the state at the time of payment.

161 Ariz. at 140, 776 P.2d at 1066. The County argues that this language precisely defines the instant case because in a claim of

tax illegality or discrimination under A.R.S. sections 42–11004 and 42–11005, a dispute always exists between the taxpayer and taxing entity at the time of payment.

¶ 15 This analysis suffers from two defects. First, the County does not explain why the facts or circumstances that give rise to a claim for a refund of discriminatory or illegal taxes under sections 42–11004 and 42–11005 cannot come to light at some point after the "first installment of tax" has been paid. Indeed, that is precisely what occurred in *Arizona Citrus Land Co.*, 55 Ariz. at 236, 100 P.2d at 587, on which the County relies. Second, and more importantly, the County takes its quote from *Pittsburgh* out of its proper context.[7] The complete quote makes it clear that the court was referring only to the statutory "under protest" requirements in existence at that time in use and transaction privilege tax cases, which the court interpreted according to the language and structure of the governing statutes alone.

¶ 16 Recent legislative actions affecting A.R.S. sections 42–11004 and 42–11005,[8] and the context in which they occurred, belie the County's insistence on any continuing payment-under-protest requirement for legal action under those statutes. In its First Regular Session in 1995, the legislature adopted chapters 29 and 249, which removed references to payment under protest from five property taxation statutes[9] and chapter 29 specifically added a new subsection (B) to section 42–204:

B. If a tax is paid as provided by subsection A of this section, it is not necessary to designate the payment as under protest in order to test the validity or amount of tax.

In its Second Regular Session in 1996, the legislature deleted A.R.S. section 42–204(B). 1996 Ariz. Sess. Laws, ch. 166, § 6. This change became effective on July 20, 1996. In a "fact sheet" for the amended bill that became chapter 166, the Senate staff reported that the bill "[r]einserts the requirement that the treasurer refund overpayment of taxes only upon claim by the taxpayer."

¶ 17 From these facts, the County draws the following inferences:

This history indicates that the legislature was well aware of the Supreme Court's interpretation of the statute to require payment under protest, even in the absence of explicit language. Had the legislature not recognized that payment under protest *was* a requirement of § 42–204 [now §§ 42–11004 and 42–11005], it would not have perceived a need to eliminate it in 1995. Conversely, before the amendment could become effective, the legislature reconsidered. By deleting the new language, it reinstated the requirement for payment under protest.

The preserved history of the amendment reinstating the requirement is set forth in the **FACT SHEET FOR S.B. 1233** . . . . As set forth in the purpose section, this Bill was offered by county treasurers. Treasurers are responsible, among other things, for "issuing monthly and annual reports to the county board of supervisors and disbursement of county monies due to the state or other entities." Consistent with Arizona Citrus, *supra*, it can reason-

---

7. In *Pittsburgh*, the court's full sentence was:

The state must refund the use and transaction privilege taxes at issue in these consolidated appeals because a tax must be paid "under protest" only when the payment is involuntary and part of a dispute between the taxpayer and the state at the time of payment.

161 Ariz. at 140, 776 P.2d at 1066.

8. Under the statutes' previous designation of A.R.S. section 42–204(A) and (C).

9. Chapter 29 removed payment-under-protest requirements from former A.R.S. sections 42–179.03(G) and 42–521(E), sections 2 and 6, and deleted superfluous references to payment under protest from former A.R.S. sections 42–204.01(A) ("regardless whether or not they were paid under protest") and 42–274(D)(1) ("whether or not paid under protest"). Sections 4 and 5. Chapter 29, section 3, amended former A.R.S. section 42–204 as indicated in the text. The changes to former sections 42–204 and 42–521 were to become effective from and after December 31, 1995. 1995 Ariz. Sess. Laws, ch. 29, § 7. The remaining changes made by chapter 29 became effective on July 13, 1995. Chapter 249, section 18, removed the payment-under-protest requirement from former A.R.S. section 42–177(E), governing appeals to the tax court in property tax matters. That amendment became effective from and after December 31, 1995. 1995 Ariz. Sess. Laws, ch. 249, § 44(B).

ably be concluded that the legislature chose to restore to treasurers the notice inherent in the requirement that payment be made under protest for those instances where the legality of the tax was challenged. [footnote omitted]. In the "provisions" section of Appendix 3, paragraph 5 is instructive. It states that the bill gives instructions regarding budgeting for refunds due to overpayments of taxes. Paragraph 6 of the "Amendments" section is dispositive. It states: "Reinserts the requirement that the treasurer refund overpayment of taxes *only upon claim by the taxpayer.*"

It is thus clear from the recorded legislative history that payment under protest remains a requirement for a claim of refund under § 42–204 [now §§ 42–11004, 42–11005].

¶ 18 The County attributes the legislature's putative change of heart to Arizona's conversion to a new property tax valuation and assessment timetable over the period from 1994 to 1996. Under the new timetable a challenge under A.R.S. sections 42–11004 and 42–11005 could now be timely filed as long as 34 months after the applicable valuation date for the property. *See generally Forum Development v. Arizona Dep't of Revenue,* 192 Ariz. 90, 961 P.2d 1038 (App. 1998) (describing and contrasting operation of former and current property tax valuation and assessment procedures).

¶ 19 For a number of reasons, we must disagree. First, as the taxpayers point out, the legislative history of the 1995 enactment of short-lived former A.R.S. section 42–204(B), quoted above, reflects unanimous support for the measure from the state's fifteen county treasurers. *Minutes of Committee on Finance, Arizona State Senate,* March 13, 1995. The legislative history also reveals a desire to bring the statutes into compliance with *Pittsburgh,* 161 Ariz. 135, 776 P.2d 1061, which is perceived as having held that a taxpayer's failure to pay under protest would not prevent him from recovering taxes to which the state was not entitled. The legislative history reflects a concomitant desire to reduce county treasurers' need to manually process the large numbers of pay-

ments "under protest" that they typically receive and the attendant delay in the administrative appeals process. *Corrected Fact Sheet for H.B. 2440, Arizona State Senate,* March 15, 1995. This background from the First Regular Session of the 42nd Legislature is an unlikely base from which the Second Regular Session of the same Legislature would have launched the 180–degree change of direction for which the County argues.

¶ 20 Moreover, as the taxpayers point out, the Senate staff's 1996 fact sheet for the bill that ultimately removed former A.R.S. section 42–204(B) does not state or even suggest an intent that a payment-under-protest requirement would be imposed or reinstated as a result. Contrary to the County's thesis, the words "[r]einserts the requirement that the treasurer refund overpayment of taxes only upon claim by the taxpayer" from the fact sheet manifestly referred to the legislature's rejection of an initial proposed amendment to former A.R.S. section 42–204.01, entitled "Refund of overpayment as a result of change in tax roll," that would have removed the words "upon claim by the taxpayer" from subsection (A) of that statute. *Compare S.B. 1233 as introduced by Senator Gnant with Cover Sheet for Senate Engrossed version of S.B. 1233.*

¶ 21 Other circumstances surrounding the 1995 and 1996 amendments of former A.R.S. section 42–204 further undermine the County's analysis. The 1995 enactments that added subsection (B) also removed two express payment-under-protest requirements from related statutes and three references to such requirements in others. The 1996 enactment that deleted former A.R.S. section 42–204(B) reinstated not a single one of the 1995 deletions.

¶ 22 Further, the County's thesis that the 1996 enactment marked a sudden reversal of course due to the legislature's adoption of a new property tax valuation and assessment timetable is implausible. The legislature adopted the new timetable in 1994. By 1995, when the legislature enacted subsection (B), it would have fully appreciated the implications of the timetable conversion and taken them into account in enacting legislation on the same general topic.

¶ 23 Additionally, the 1996 enactment that deleted former A.R.S. section 42–204(B) made amendments in the language of forty-one other sections of the Arizona Revised Statutes relating to property taxation. Most of these changes were in matters of form and style and had the evident purpose of modernizing and clarifying the statutory language. *See, e.g.,* former A.R.S. §§ 42–165, 42–310(A), and 42–353 as amended by 1996 Ariz. Sess. Laws, ch. 166, §§ 3, 13, and 17, respectively. Other changes may have reflected more substance, but focused primarily on internal county property tax administrative procedures. *See, e.g.,* A.R.S. § 35–145, as amended by 1996 Ariz. Sess. Laws, ch. 166, § 2, and former A.R.S. § 42–344(A), as amended by § 18. None of these changes effected any dramatic reversals or alterations of substantive property tax policy. Because the enactment as a whole focused on technical and housekeeping matters, it is unlikely that the legislature intended the deletion of subsection (B) of former A.R.S. section 42–204 to have the impact attributed to it by the County.

¶ 24 The County's position would require us to accept not only the view that the legislature intended to reimpose a payment-under-protest requirement for actions under A.R.S. sections 42–11004 and 42–11005, but also that it chose to do so without adopting any language that clearly said so. The legislature enacted the statutory language which it intended. It did not adopt a payment-under-protest requirement by inference or omission when eliminating an explicit, contrary provision that it had adopted only the previous year. Such would not be a logical or accepted method by which the legislature would reconstitute a long-standing provision which contained language that never suggested any such requirement. "The Arizona legislature expressly manifested its intent and purpose by enacting [sections 42–11004 and 42–11005] and this Court cannot deny the statute's plain meaning." *State v. Edwards,* 103 Ariz. 487, 489, 446 P.2d 1, 3 (1968).

¶ 25 The trial court did not err in denying the County's motion for summary judgment on the theory that the trial court lacked jurisdiction in the taxpayers' refund actions.

COUNTY'S PRIOR PAYMENT OF LEGALLY IDENTICAL REFUND CLAIMS OF SIMILARLY SITUATED APARTMENT OWNERS THROUGH SETTLEMENT OF LITIGATION

¶ 26 ADOR and the County both assail the trial court's holding:

[W]here the County has two taxpayer groups with identical claims before it at the same time, and under the identical circumstances, the County cannot honor the claims of one group and deny the claims of the other group without creating impermissible discrimination in violation of the United States and Arizona constitutions.

This Court has determined that settlement of the claims brought by the Evans–Withycombe claimants and the failure to settle the identical claims brought by these Plaintiffs violates the Equal Protection Clause of the United States Constitution and article IX § 1, of the Arizona Constitution.

¶ 27 In their opening briefs, ADOR and the County argue that this holding was error because it allowed the taxpayers "to use a judgment from a case in which they were not a party against their opponent who was a party to the other action." ADOR and the County contend that the taxpayers thus used collateral estoppel against the government "offensively" in contravention of our holding in *First Interstate Bank of Arizona v. Arizona Department of Revenue,* 185 Ariz. 433, 436, 916 P.2d 1149, 1152 (App.1995), *disapproved on other grounds by Rogers Corp. v. State Dep't of Revenue,* 187 Ariz. 157, 158, n. 1, 927 P.2d 817, 818 (App.1996). Although the trial court did not specifically state that it was applying offensive collateral estoppel in its ruling, ADOR and the County contend that the decision was either based upon collateral estoppel or constituted the offensive use of collateral estoppel.

¶ 28 Nonetheless, the taxpayers argue that the doctrine of collateral estoppel is irrelevant in this appeal. Based upon the plain wording of the trial court's holding, we agree. As we observed above, the taxpayers moved

for summary judgment on two theories, that ADOR's and the County's position in this action was precluded by the doctrine of virtual representation, and that ADOR's and the County's refusal to accede to the taxpayers' demands for relief in this case constituted discrimination in violation of the Equal Protection Clause of the United States Constitution and the Uniformity Clause of the Arizona Constitution. ADOR and the County addressed those issues in opposing the taxpayers' motion.

¶ 29 We are convinced that the trial court ruled for the taxpayers on their discrimination theory alone. The court did not rule on or even address the taxpayers' theory of defense based on the doctrine of virtual representation, and most definitely did not hold that the taxpayers were entitled to summary judgment due to the collateral estoppel effect of the Evans–Withycombe settlement. Moreover, ADOR and the County cite no authority for the proposition that a court's ruling for a plaintiff on one legal theory is subject to reversal when a hypothetical ruling on a distinct legal theory with a similar practical effect would have been legally incorrect. We do not further explore the applicability of collateral estoppel or virtual representation principles as such in this appeal.

¶ 30 ADOR and the County argue that the trial court's holding will require taxing authorities to litigate and appeal every adverse decision without regard to limitations on their resources. *Cf. First Interstate Bank,* 185 Ariz. at 436, 916 P.2d at 1152 (holding offensive collateral estoppel unavailable against government). They contend that the policy reasons we cited in *First Interstate Bank* [10] mitigate the tax court's ruling for the taxpayers here. They argue:

> [T]he County was faced with four different cases raising the same issues and had to decide whether its resources would be best expended in defending the *Evans* case or one of the other cases. The County chose to settle the *Evans* litigation and concentrate its resources on the *Aida Renta* action. These decisions routinely confront governments in litigation and the State and counties must be allowed to make case management decisions in order to operate effectively and efficiently in representing the interests of their clients.

¶ 31 In response, the taxpayers argue that in view of the identity of circumstances between themselves and the Evans–Withycombe taxpayers, ADOR and the County are exaggerating when they argue that the trial court's ruling would deter governments from settling cases. The taxpayers further urge that the relevant point in this appeal is not that the Evans–Withycombe case was settled. It is rather that through the settlement, appellants honored the Evans–Withycombe taxpayers' claims unconditionally, revalued their properties in accordance with their theory of recovery, and refunded the taxes they claimed to have overpaid. By failing to do the same for these taxpayers, the taxpayers contend that ADOR and the County discriminated against them on grounds unacceptable under either the Equal Protection or Uniformity Clauses.

¶ 32 In *State of Kansas ex rel. Frizzell v. Dwyer,* 204 Kan. 3, 460 P.2d 507, 511 (1969), the Kansas Supreme Court discussed the practical public policy underlying the need for agency discretion in taxing matters:

> The dominant principle of our constitutional mandate is that property shall be assessed for taxation under uniform rules so that equality in the burden of taxation results. Yet practical problems in the administration of a taxing system always remain; absolute or perfect equality in taxation, being impossible of attainment, is not required. As long as there is substantial

---

10. In *First Interstate Bank* we rejected the use of offensive collateral estoppel against the government. There, the plaintiffs contended that ADOR was equitably estopped to argue that the county assessor had properly placed Bank personal property on the unsecured roll because it had litigated, lost, and failed to appeal that issue against a different taxpayer. We disagreed:

> It would be bad policy to require the government, in every instance, to appeal every adverse decision for fear of being foreclosed from relitigating the same issue against a different party in the future. Such a requirement would put an undue burden on the state.
> 185 Ariz. at 436, 916 P.2d at 1152.

uniformity in the application of tax statutes, constitutional provisions relating to equality and uniformity are not violated (see 84 C.J.S. Taxation § 22 a and b; 1 Cooley, Taxation, § 259).

One element to be considered in determining subjection of various kinds of personal property to tax liability is the expense attendant. . . .

. . .

Certainly the state is not obliged to tax property when the cost . . . would be greater than the amount received.

■ ¶ 33 We held in *Hibbs v. Calcot, Ltd.*, 166 Ariz. 210, 219, 801 P.2d 445, 454 (App. 1990), a tax case challenging a classification of property, that the evidence supplied by a taxpayer did not support the inference that commercial classification of the taxpayer's property would result in impermissible discrimination. There we similarly addressed the need for selective determination of the allocation of limited agency resources:

> [The taxpayer's] evidence at best suggests that the Department has been insufficiently thoroughgoing in enforcing a statutorily appropriate policy of classifying commercial properties according to their use. To establish unreasonable discrimination requires greater proof than this. In *United States v. Wilson*, 639 F.2d 500, 505 (9th Cir.1981), the court recognized that *tax authorities must "practice some degree of selectivity in deploying their limited enforcement resources."* Though that court addressed a question of selective tax prosecution, its comment applies equally to questions of classification enforcement. In this case, [the taxpayer's] evidence does not support an inference that the classification of its property was a product of intentional or arbitrary discrimination. [citation omitted]. No impermissible discrimination has been shown.

*Id.* at 218, 801 P.2d at 453 (emphasis added).

¶ 34 We conclude that a strong policy basis exists supporting agency discretion in litigation matters. We adopt the above-quoted principles set forth in *Kansas* and *Hibbs,* which provide ADOR and the County with a rational basis when confronted with the need to exercise agency discretion while carrying out its statutorily-mandated functions. Within these functions is conducting litigation, which here should have resulted in the County's and ADOR's success at trial.

**Equal Protection**

¶ 35 The current status of equal protection analysis as applied to taxation can be best demonstrated by contrasting two leading decisions of the United States Supreme Court in that area. In *Allegheny Pittsburgh Coal Co. v. Webster County,* 488 U.S. 336, 338, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989), the Court invalidated a county's property tax valuation system as a violation of the Equal Protection Clause. In *Allegheny,* the West Virginia constitution required that property taxes be "equal and uniform" and all property be taxed in proportion to its value. *See id.* at 338, 109 S.Ct. 633. The Webster County Assessor followed a practice of valuing real property at 50% of the price that had been paid for it when it was most recently sold. *See id.* The taxpayer complained that through this practice the valuation of its property had been set at a figure many times larger than the valuation of neighboring properties virtually identical to the taxpayer's. *See id.* at 339, 109 S.Ct. 633. The assessor did not dispute that her system produced this result, but nevertheless refused to deviate from it. *See id.*

¶ 36 In analyzing the taxpayer's equal protection claim, the Court acknowledged that a state could classify property and impose differing tax burdens on the classifications as long as the classifications and burdens arguably related to a legitimate interest of the state. *See id.* at 344, 109 S.Ct. 633. The Court also observed that equal protection principles did not require the state to immediately adjust property valuations according to market developments or recent comparable sales. *See id.* at 343, 109 S.Ct. 633.

¶ 37 According to the Court, the Equal Protection Clause nevertheless required the state to take steps toward "the seasonable attainment of a rough equality in tax treatment of similarly situated property owners." *Id.* In view of the "equal and uniform" and tax-proportionality-to-value requirements of

the state constitution, the Court indicated the assessor could not argue that her practice resulted from a legislative policy against allowing property valuations to increase due to inflation alone. *See id.* at 344, 109 S.Ct. 633. The Court termed the assessor's practice an "aberrational enforcement policy" that taxed similar properties differently only because the assessor refused to take any steps to modify the inequality. *Id.* at n. 4. As applied, the County's assessment system violated equal protection because it failed the rational basis test. *See id.* at 343, 109 S.Ct. 633.

¶ 38 The Court again measured a state's property taxation system against the rational basis test under the Equal Protection Clause in *Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). A California constitutional provision that resulted from a 1978 initiative called "Proposition 13" capped real property taxes at one percent of the full cash value determined for the property in the 1975–76 tax year. *See id.* at 5, 112 S.Ct. 2326. Valuation increases due to inflation could not exceed two percent per year. *See id.* Unlimited revaluation could occur only when property changed ownership or was newly constructed after 1975. *See id.*

¶ 39 In *Nordlinger,* the Court stated that these classifications would not be violative of equal protection "so long as there is a plausible policy reason for the classification" and "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker." *Id.* at 10–11, 112 S.Ct. 2326. The Court sustained the classification in question because the Court was able to discern that the classification would encourage stable neighborhoods by obviating the need for property owners to sell their property to pay tax levies increased by inflation. *See id.* at 12, 112 S.Ct. 2326. Additionally, the Court held the state could permissibly protect the reliance interests of persons who had purchased property with a low assessment and had not anticipated the need to pay higher taxes due to inflation. *See id.* at 12–13, 112 S.Ct. 2326. Because the classification was at least arguably related to legitimate state interests, the Court made no inquiry into the likelihood that the classification would actually promote those interests. *See id.*

¶ 40 The Court distinguished *Allegheny* as "the rare case where the facts precluded any plausible inference that the reason for unequal assessment practice was to achieve the benefits" of any articulated legitimate state interest. *Id.* at 16, 112 S.Ct. 2326. The complete arbitrariness of the governmental practice challenged in *Allegheny* failed to clear even the low hurdle erected by the rational basis test. 488 U.S. at 343, 109 S.Ct. 633. The Court had no difficulty, however, in holding that the rational connection between the statutory classifications at issue in *Nordlinger* and legitimate state interests that could be imagined or inferred under the circumstances was not so attenuated that the classification had to be invalidated as arbitrary and capricious. 505 U.S. at 18, 112 S.Ct. 2326.

¶ 41 From *Nordlinger,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1, and *Allegheny,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688, we summarize the equal protection principles applicable to matters of taxation in this way: A governmental classification for the purpose of taxation, whether created by statute alone or by the actions of government officials in applying a statute, complies with the Equal Protection Clause unless the classification is arbitrary and capricious, or in other words, unless (1) no plausible policy reason exists for the classification, or (2) the court can neither conceive nor infer from the circumstances the existence of legislative facts underpinning the classification that the governmental decisionmaker could rationally have considered to be true. We apply this "rational basis" test unless the taxpayer can demonstrate that the classification warrants some form of heightened review. *Savage v. Munn,* 317 Or. 283, 856 P.2d 298, 305 (1993).

¶ 42 In a recent case, we recently re-stated the rational basis test as follows:

We normally subject economic legislation to the rational basis test. *Arizona Downs v. Arizona Horsemen's Found.,* 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981). To satisfy this test, a statutory classification "must be rationally and reasonably

related to furthering" a legitimate state interest. *Big D Constr. Corp. v. Court of Appeals,* 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990). We will uphold a classification if we can imagine any set of facts rationally justifying it. *State v. Kelly,* 111 Ariz. 181, 184, 526 P.2d 720, 723 (1974), *cert. denied sub nom. Kelly v. Arizona,* 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975).

*General Motors Corp. v. Arizona Dep't of Revenue,* 189 Ariz. 86, 92–93, 938 P.2d 481, 487–88 (App.1996), *disapproved on other grounds by Valencia Energy Co. v. Arizona Dep't of Revenue,* 191 Ariz. 565, 570, 959 P.2d 1256, 1261 (1998). This articulation is fully congruent with *Nordlinger* and *Allegheny.* Additionally, when their facts are compared, *Nordlinger* and *Allegheny* strikingly demonstrate the high degree of deference to governmental line-drawing that the modern rational basis test embodies.

¶ 43 Against the foregoing backdrop, some of the Arizona case law addressing "discrimination" in tax cases may appear to deviate from correct constitutional doctrine. We refer to a long line of Arizona decisions that have resolved claims of discrimination in violation of both the Equal Protection and Uniformity Clauses in whole or in part by focusing on whether the complaining taxpayer could demonstrate "deliberate" or "intentional" and "systematic" overvaluation of the taxpayer's property in comparison to similar properties. *See Security Properties v. Arizona Dep't of Property Valuation,* 112 Ariz. 54, 57, 537 P.2d 924, 927 (1975); *McCluskey v. Sparks,* 80 Ariz. 15, 19, 291 P.2d 791, 793 (1955); *Hibbs,* 166 Ariz. at 218, 801 P.2d at 453; *Maricopa County v. North Central Dev. Co.,* 115 Ariz. 540, 543, 566 P.2d 688, 691 (App.1977); *Hillock v. Bade,* 22 Ariz.App. 46, 51, 523 P.2d 97, 102 (1974), *aff'd* 111 Ariz. 585, 535 P.2d 1302 (1975); *see also General Motors Corp.,* 189 Ariz. at 93, 938 P.2d at 488 (income taxation); *Brink Electric Const. Co. v. Arizona Dep't of Revenue,* 184 Ariz. 354, 362, 909 P.2d 421, 429 (App.1995) (contracting excise); *Sonitrol of Maricopa County v. City of Phoenix,* 181 Ariz. 413, 422, 891 P.2d 880, 889 (App.1994) (municipal excise on telecommunications business); *Tucson Mechanical Contracting, Inc. v. Arizona Dep't of Revenue,* 175 Ariz. 176, 181, 854 P.2d 1162, 1167 (App.1992) (contracting excise).

¶ 44 In fact these decisions correctly focus on an essential feature of equal protection and uniformity principles—the existence of a true governmental "classification" to which the relevant analysis may be applied. Basic constitutional jurisprudence holds that governments may classify both people and property by statute ("on its face") or by differential administrative application of a neutral statute ("application" or "purpose and effect"). *See generally* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 18.4 at 42 (2d ed.1992). By insisting that the challenged action result from "systematic and intentional discrimination" and not merely from random mishap, "oversight," "negligence," or bungling, *see, e.g., Hibbs,* 166 Ariz. at 218, 801 P.2d at 453; *Gosnell Dev. Corp. v. Arizona Dep't of Revenue,* 154 Ariz. 539, 541, 744 P.2d 451, 453 (App.1987), these cases do no more than require that the plaintiff demonstrate the existence of a genuine governmental "classification."

¶ 45 Once this connection becomes clear, applying equal protection analysis in this case is relatively straightforward. The challenged governmental action here is the County's decision to accede to the refund demand asserted by the Evans–Withycombe taxpayers, while simultaneously refusing to accede to the legally identical refund demand asserted by the taxpayer-appellees in the instant case. Though the County took this action only once, it did so for an articulable policy reason. It is undisputed that the two groups of taxpayers and their properties were identically situated in all relevant respects, and although they were treated identically prior to the County's refusal to settle with both groups, the County's action treated the two groups and their properties differently. Taxpayer-appellees thus rely on the argument that the County conceived and applied distinct "classifications" to the two groups of taxpayers and their two groups of properties.

¶ 46 However, these claimed classifications survive the taxpayers' equal protection chal-

lenge if we can infer a set of facts underpinning the classifications that the County might rationally have believed and that was rationally related to furthering a plausible governmental interest. Here, the County might have rationally believed it was in the County's taxpayers' best interests to dispose of litigation in which a relatively small amount was at stake in favor of focusing its resources on defending an action brought by identically situated taxpayers raising legally identical issues in which a far larger sum was at stake. We need not and do not consider whether these were the County officials' actual beliefs or whether the action actually promoted the best interests of the County's taxpayers. The claimed classifications and actions of the County had a rational basis and did not violate equal protection principles.

**Uniformity Clause**

¶ 47 The substantive requirements of Arizona's Uniformity Clause differ significantly from those of the Equal Protection Clause. The Equal Protection Clause does not require uniformity of property taxation; rather, it requires only that any discrimination be rationally based. *See Savage,* 856 P.2d at 305. In contrast, the Uniformity Clause requires that "[a]ll taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax, and shall be levied and collected for public purposes only." Ariz. Const. art. 9, § 1.

■■■ ¶ 48 Under the Uniformity Clause, the legislative classification of property for tax purposes must not be discriminatory. Classifications for tax purposes must be based on the nature of the property or on its use, utility, or productivity. *See Cutter Aviation, Inc. v. Arizona Dep't of Revenue,* 191 Ariz. 485, 495, 958 P.2d 1, 11 (App.1997); *In re America West Airlines, Inc.,* 179 Ariz. 528, 535, 880 P.2d 1074, 1081 (1994). Additionally, once the legislature has determined the classifications of property for tax purposes, the assessment of property within those classifications must not be discriminatory. Nevertheless, assessments of property within the same class need not be exactly equal. Unequal assessments resulting from mere errors in judgment do not violate the Uniformity Clause. *See Westin Tucson Hotel Co. v. Arizona Dep't of Revenue,* 188 Ariz. 360, 366, 936 P.2d 183, 189 (App.1997); *North Central,* 115 Ariz. at 543, 566 P.2d at 691. To violate the Uniformity Clause, unequal assessments must be the result of "systematic and intentional conduct on the part of the assessing official." *Westin,* 188 Ariz. at 366, 936 P.2d at 189 (quoting *North Central,* 115 Ariz. at 543, 566 P.2d at 691).

¶ 49 The taxpayers in this case and the Evans–Withycombe plaintiffs in a companion case contended that they were impermissibly discriminated against when the County revalued their apartment properties rather than "roll-over" their previous valuations. Whether this revaluation constituted an impermissible classification or discriminatory assessment was never decided by the trial court. Instead, the trial court granted summary judgment for the taxpayers on the theory that the County discriminated against the taxpayers by settling with the Evans–Withycombe plaintiffs and failing to settle with the taxpayers.

¶ 50 To prevail on their claim that the Uniformity Clause was violated, the taxpayers were required to show unequal treatment that resulted from intentional and systematic conduct. *Westin,* 188 Ariz. at 366, 936 P.2d at 189. Relying on federal law, our supreme court has held that discriminatory, systematic conduct involves a *practice* adopted by the taxing authority. *McCluskey,* 80 Ariz. at 20, 291 P.2d at 794. Later Arizona cases dealing with the Uniformity Clause involve systematic discrimination resulting from a plan or practice adopted by the taxing authority. *See Hillock,* 22 Ariz.App. 46, 523 P.2d 97 (cyclic revaluation plan adopted by the taxing authority did not involve arbitrary discrimination and therefore did not violate any constitutional rights); *Security Properties,* 112 Ariz. 54, 537 P.2d 924 (taxpayers' rights not violated by taxing authority's assessment plan that did not deliberately create inequality); *North Central,* 115 Ariz. 540, 566 P.2d 688 (taxing authority's plan targeting only the most prominent properties in its jurisdiction for revaluation was intentionally discriminatory); *Gosnell Dev. Corp.,* 154 Ariz. 539, 744 P.2d 451 (taxing authority's blanket poli-

cy of excusing those who underpaid transaction privilege tax was discriminatory).

¶ 51 Here, the record contains no evidence that the County's decision to settle with the Evans–Withycombe plaintiffs and not the taxpayers in this case was part of a discriminatory system of taxation. In *Westin*, we concluded that a Uniformity Clause violation was not shown where Westin Tucson Hotel established that the assessor conferred a tax benefit on one taxpayer, but failed to establish that such benefit was "routinely granted to other taxpayers in similar situations." 188 Ariz. at 366, 936 P.2d at 189. Here, the taxpayers have not established that the County has a policy, practice, or system that favors certain plaintiff-taxpayers over others, nor have they established that the taxpayers in this case were denied a benefit routinely granted to others. What taxpayers have established is that the County settled a single case and granted a refund to the parties involved in that case. Following *Westin*, we find no violation of the Uniformity Clause.

¶ 52 The taxpayers request an award of attorney's fees under A.R.S. section 12–348 (Supp.1998). As they are not the prevailing parties, the request is denied. The judgment is affirmed in part and reversed in part as discussed in this opinion.

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge, and PHILIP E. TOCI, Judge.