935 P.2d 898

**SMP II LIMITED PARTNERSHIP, a partnership, Plaintiff–Appellee, Cross Appellant,**

v.

**ARIZONA DEPARTMENT OF REVENUE, an agency of the State of Arizona; Maricopa County, a political subdivision of the State of Arizona, Defendants–Appellants, Cross Appellees.**

**No. 1 CA–TX 95–0005.**

Court of Appeals of Arizona, Division 1, Department T.

Nov. 5, 1996.

Review Denied April 29, 1997.

---

Donald P. Roelke and Fennemore Craig, P.C. by Paul J. Mooney, Phoenix, for Plaintiff–Appellee, Cross Appellant.

Helm & Kyle, Ltd. by John D. Helm, Roberta S. Livesay, Tempe, for Defendants–Appellants, Cross Appellees.

## OPINION

SULT, Judge.

Maricopa County and the Arizona Department of Revenue ("appellants") appeal from a tax court judgment reducing the 1992 full cash value of the Sheraton San Marcos Resort to $6,780,000. Appellants also appeal from the tax court's order denying their motion for new trial. SMP II Limited Partnership ("taxpayer") cross-appeals from the tax court's ruling that its expert witness costs were part of the total sum subject to the $20,000 cap imposed by Arizona Revised Statutes Annotated ("A.R.S.") section 12–348(E)(5) (1992).

## FACTUAL AND PROCEDURAL HISTORY

Taxpayer owns the San Marcos Resort ("the resort") which is situated on approximately 12 acres of land in downtown Chandler, Arizona. The resort consists of the primary hotel building, which was built in 1912 and thereafter remodeled, and other amenities constructed in 1987. These include guest rooms, a pool, and tennis courts. Associated with the resort is a 113–acre golf course, which had been valued separately from the resort and was not a part of this valuation proceeding.

For 1992, the Maricopa County Assessor assigned an aggregate full cash value of $15,649,535 to the 32 tax parcels which taxpayer identified as the resort portion of the San Marcos. Through appeals to the Maricopa County Board of Equalization and the State Board of Tax Appeals, taxpayer obtained a reduction of the full cash value to $11,110,417.

In August 1992, taxpayer brought this action seeking a further reduction from the State Board's valuation. At trial, taxpayer offered the testimony of its expert appraiser, Tom Turner. Turner testified to a valuation of $6,730,000 for the resort, later revised post-trial to $6,780,000 due to correction of a subtraction error. Appellants moved to strike Turner's appraisal and testimony on the ground that it was based, in part, on income and expense data which related to a period later than the assessment date of January 1, 1992. Since the valuation is required to be made as of the assessment date, appellants argued that the use of this data resulted in an inadmissible valuation. Appellants renewed this objection when they moved for a directed verdict at the close of the evidence. The tax court denied both motions.

Appellants offered the testimony of their expert appraiser, Lawrence Bloom. Bloom testified to a valuation for the property of $8,400,000. His valuation included parcel 107A which had originally been included by taxpayer as one of the 32 parcels comprising the resort. At the time of Bloom's testimony, this parcel had not been excluded by the tax court as part of the property to be valued. However, as described below, the tax court later excluded this parcel from the resort's valuation base.

In the parties' joint pretrial statement, taxpayer advanced for the first time the position that parcel 107A should be excluded from the action because it represented the golf course restaurant and pro shop building and thus constituted a part of the golf course. On the first day of trial, taxpayer moved to dismiss parcel 107A from the action. Appellants opposed the motion, noting that parcel 107A had been included in the appeal from the start. Appellants asserted that the first notice they had that taxpayer intended to characterize parcel 107A as part of the golf course was in the joint pretrial statement circulated after appellants' expert had already produced a written appraisal that factored in the income and expenses of the golf

course restaurant. Appellants argued that taxpayer's attempted dismissal at trial of parcel 107A was a violation of the notice requirement of Rule 26.1, Arizona Rules of Civil Procedure ("Ariz.R.Civ.P."), and severely prejudiced them since their expert had included the parcel in his valuation.

The tax court initially denied taxpayer's motion, but thereafter granted it when taxpayer renewed the motion at the close of the trial. The tax court then adopted as its valuation the figure provided by taxpayer's expert, namely, $6,780,000. Appellants moved for a new trial, renewing their objection to Turner's appraisal and requesting a recalculation of the valuation figure due to other asserted errors. The motion was denied and the tax court entered judgment on its verdict and also awarded taxpayer $20,000 in attorney's fees, expenses and costs. In so doing, the tax court determined that section 12–348(E)(5) required that expert witness fees be included with attorney's fees in the $20,000 cap placed on awards to prevailing taxpayers under section 12–348(B).

## ISSUES

Appellants present the following issues:

1. Whether the tax court erred in declining to strike the testimony and appraisal report of taxpayer's expert;

2. Whether the tax court erred in granting taxpayer's motion to exclude parcel 107A from taxpayer's appeal;

3. Whether the tax court abused its discretion in denying appellants' motion for new trial; and

4. Whether the record lacks substantial competent evidence supporting the tax court's valuation ruling.

Taxpayer's cross-appeal raises two additional issues:

1. Whether the $20,000 cap imposed by section 12–348(E)(5) encompasses all "fees or other expenses" as defined by section 12–348(I)(1); and

2. Whether the $20,000 cap applies in full to awards against each governmental defendant.

## DISCUSSION

### 1. The Appraisal and Testimony of Taxpayer's Expert

Turner explained that his appraisal relied on the discounted cash flow method under the income approach. He testified:

The discounted cash flow analysis is the discounting of the income stream for the property over a projected period. Resort hotels, lodging and most commercial industrial investment properties are bought for a holding period of somewheres generally from seven to ten years. We elected to do a ten-year discounted cash flow analysis. In the discounted cash flow analysis, you begin with today what's happening and today is in this instance what is today's average daily rate? What is today's occupancy? What is this hotel doing today? And then you try to project your nine additional years into the future. How is this hotel going to perform in each of these income and expense categories. We did that.

When we did that, we determined that this particular property, the San Marcos hotel, has been since renovation back in '87 on a constant increase, improvement in average daily rate and occupancy. We continued to trend that improvement.

According to Turner's approach, the historical trend since 1987 had shown steady annual increases in the average daily room rate ("ADR"). Therefore, the projection of ADR beginning "today," namely the assessment date of January 1, 1992, should have been upward. However, instead of projecting such continuous increases, Turner held the ADR constant at $70 for both 1992 and 1993, and only thereafter allowed it to rise steadily. On direct examination, Turner testified:

Q. And you have assumed that the average daily rate in 1992 would be $70?

A. Yes.

Q. What was that based on?

A. That's what it was presently operating at the end of 1991, was something near or less than $70.

Q. Why did you hold that constant for two years?

A. That was a question I couldn't remember in my deposition. I went back and I talked with a couple of guys that worked with me on this. The reason that we did—*and I don't know that it's a valid reason for this particular tax purpose,* but when we picked up the operating statements the last visit to the hotel, they gave us year-to-date 1992 and I believe it was either through July or August of '92 and we kind of fudged. *We looked to see how they were operating for the first seven or eight months and it didn't appear that they were going to hit the $70 figure in '92, so we elected—in our best judgment, we held it at $70 in '93.*

Q. And then started increasing it progressively each year?

A. Yes.

(Emphasis added.)

On cross examination, Turner testified that he had stated in deposition that by keeping the ADR at $70 for both 1992 and 1993, he was not following what he believed to be historical trends. He admitted that his use of actual 1992 operating figures had a downward effect on the total projected revenues generated in his discounted cash flow model. Turner explained that this was because the effect of holding the ADR constant for the two years of 1992 and 1993 compounded itself every year for the following eight years.

On appeal, appellants argue that because Turner had relied on evidence that had not come into existence until after the assessment date of January 1, 1992, his testimony and appraisal report were inadmissible.[1] Appellants cite *State Tax Commission v. United Verde Extension Mining Company,* 39 Ariz. 136, 4 P.2d 395, *aff'd on reh'g.,* 39 Ariz. 331, 6 P.2d 889 (1931), where our supreme court held that "the trial court is limited in determining the true value to evidence which was in existence at the time the assessment is made." *Id.* at 141, 4 P.2d at 400.

Taxpayer responds by acknowledging the rule that a valuation decision must be based solely on evidence in existence as of the assessment date. Moreover, taxpayer does not deny that its expert did, to some extent, base his valuation on post-January 1, 1992 information. However, taxpayer argues that appellants waived this objection by failing to properly object in the tax court. Alternatively, taxpayer impliedly asserts that even if the valuation evidence was improperly admitted, there is adequate other evidence to support the tax court's determination of valuation. We address these arguments in turn.

■ An objection to evidence concerning post-assessment data is waivable. *Department of Revenue v. Transamerica Title Ins. Co.,* 117 Ariz. 26, 29–30, 570 P.2d 797, 800–01 (App.1977). Taxpayer contends that waiver occurred here because appellants: (1) did not object to the introduction of Turner's appraisal report; (2) did not object to the introduction of exhibit 117, the resort manager's spreadsheet with operating figures from 1987 through 1993; and (3) did not object to the introduction of exhibit 147, Turner's adjusted discounted cash flow analysis. We cannot agree that any of these events effected a waiver of appellants' objection.

■ A waiver is a voluntary relinquishment of a known right, and without knowledge of a right there can be no waiver. *In re Appeals in Maricopa County Juvenile Actions Nos. JV119590 and JV118201,* 167 Ariz. 591, 810 P.2d 589 (App.1990). With respect to Turner's appraisal report, we have reviewed it and find nothing therein that would suggest that any of the projections or analyses it contains were based on evidence that was not in existence on January 1, 1992. It became clear that Turner had relied on such evidence only when he so testified in the trial. Appellants' counsel confirmed this testimony on cross examination, then seasonably moved to strike when Turner left the stand. There was no waiver here.

■ Exhibit 117 was a compilation of raw data regarding the resort's operations and did not purport in any way to be a valuation

---

1. Appellants also raised as an objection to Turner's appraisal and testimony that the taxpayer had failed to reveal before trial that Turner had relied on actual post-January 1, 1992 figures in reaching his conclusions, in violation of Rule 26.1, Ariz.R.Civ.P. Because of our disposition of this evidence on substantive grounds, we need not address the Rule 26.1 objection.

of the property. Neither side in this case asked the tax court itself to determine a valuation based on such data. Both sides instead appropriately offered expert testimony and analysis to assist the tax court in determining a value. The post-January 1, 1992 information in exhibit 117 was not offered as evidence of the resort's value, and nothing in the trial at that point suggested that Turner had in fact considered that exhibit, or any similar information, in formulating his appraisal. Rather, when taxpayer's counsel later began to question Turner about post-January 1, 1992 information from exhibit 117, appellants' counsel appropriately objected. There was no waiver in connection with this exhibit.

■ Finally, appellants did not waive their objection through their actions with respect to exhibit 147. This exhibit merely presented in summary form the results of a recalculation of Turner's discounted cash flow analysis with different assumptions. It did not itself reflect consideration of post-January 1, 1992 information any more than did Turner's original appraisal report. Moreover, the later introduction of exhibit 147 was merely cumulative of Turner's testimony to which appellants had already objected unsuccessfully. As appellants' counsel stated with respect to this exhibit, "the fat's in the fire." Again, we find no waiver.[2]

■ The issue of the admissibility of Turner's valuation having properly been preserved for appeal, we hold that under *State Tax Commission v. United Verde Extension Mining Company, supra,* the tax court erred in adopting that valuation because it was based on data that rendered it legally inadmissible. Moreover, we do not agree with taxpayer's implied assertion that the error was insignificant and that there is sufficient support for the judgment in the balance of

Tuner's report, as well as from other evidence. As a result of Turner's revised discounted cash flow analysis, which he performed during trial, Turner ultimately valued the resort at $6,780,000.[3] Since the tax court adopted this exact figure as its finding of valuation, it is obvious that the court relied exclusively on Turner's in-court valuation.

This valuation, however, was derived from the tainted analysis in Turner's original appraisal report. The taint was not insignificant. In using the actual 1992 data to hold the projected 1992 and 1993 ADR at $70, instead of following the historical upward trend which would yield a higher ADR, Turner effectively lowered the projected ADR for all subsequent years as well. Extrapolated over the ten-year period adopted for his analysis, this lowered projection resulted in a significantly lowered valuation of the resort. Thus, we cannot say that the tax court's error was harmless.

■ Appellants suggest that all we need do at this point is reverse with directions to the tax court to enter judgment in accordance with the valuation placed on the property by their expert, Lawrence Bloom. With respect to Bloom's appraisal, the tax court had this to say:

There are several flaws in Mr. Bloom's analysis. Those flaws include Mr. Bloom's use of a 366 day year in his calculations rather than the appropriate 365 day year, his failure to adjust certain items of expense and income attributable to those golf course operations of the resort not the subject of this appeal, his overadjustment of some expense items to inaccurately reflect the estimated operating expenses, and his failure to make other necessary adjustments to the income, expenses and the capitalization rate used in his approach to

---

2. We also note that in the early stages of the trial, taxpayer offered Exhibit 5, which was the actual 1992 income and expense figures for the resort. Appellants made an objection to the court considering such post-January 1, 1992 information, as well as a Rule 26.1 discovery objection. While the trial court ultimately sustained the discovery objection, this offer and objection demonstrates that throughout the trial, taxpayer attempted to inject post-January 1, 1992 informa-

tion, and appellants regularly and unsuccessfully objected.

3. Turner's testimony, derived from Exhibit 147, was that the resort's value was $6,730,000. However, as previously noted, the exhibit contained a subtraction error which was corrected in taxpayer's post-trial memorandum, resulting in the corrected valuation figure of $6,780,000.

valuation. These flaws resulted in an inflated value.

In light of this criticism, which we have no basis to question, we cannot say that in the absence of Turner's opinion and report, the tax court would have been required to accept Bloom's valuation conclusions. We conclude that the only appropriate disposition is a remand for further proceedings to permit the tax court to obtain competent evidence on which to base a proper valuation.

## 2. Other Issues on Appeal

Because of our disposition on the issue of the Turner appraisal and testimony, we need only briefly address appellants' remaining issues. On a retrial by the tax court, the issue of parcel 107A appears moot.[4] Appellants did not object to taxpayer's right to exclude the parcel from the appeal. Rather, appellants' only objection was that their expert's opinion was prejudiced by the untimeliness of the disclosure that the parcel was to be excluded. Appellants' expert will now have the opportunity to revise his opinion of value based on the exclusion of the parcel.

Appellants' motion for new trial included assertions of various factual and legal errors in the tax court's valuation that were in addition to appellants' primary argument regarding Turner's appraisal. We cannot say whether any of these alleged errors will recur on retrial. If so, they are best dealt with by the tax court at that time.

Appellants also urged that Turner's appraisal and testimony be stricken under Rule 26.1. Appellants argued that the failure to disclose until trial that Turner had used and relied on post-January 1, 1992 data justified such a sanction. Because of our disposition

regarding this evidence, we need not address this argument.

## 3. The Cross–Appeal

Although the award of attorney's fees, expenses and costs to taxpayer must be vacated, the issues taxpayer raises on cross-appeal may arise again on remand. For this reason and because the issues are of statewide importance, we elect to address them.

Taxpayer claimed attorney's fees totalling $21,080, expert witness compensation of $9,400, and taxable costs of $2,352.82, all pursuant to A.R.S. section 12–348(B). The tax court awarded taxpayer its taxable costs in full. However, it combined the attorney's fee and expert witness expense into one award of $20,000. The court held that the $20,000 cap, imposed by section 12–348(E)(5) on "fees" awarded under subsection (B), was intended to include expert witness expense along with attorney's fees. Taxpayer argues it was error for the tax court to do so and also contends the tax court erred in failing to treat the $20,000 cap as applicable in full to each of the two appellants.

Section 12–348(B) permits a discretionary award of "fees and other expenses" to a party who prevails against the state or county in an action brought by the party against those entities challenging an assessment or collection of taxes. Pertaining to subsection (B) awards, subsection (E)(5) provides that an award of "fees" shall not exceed $20,000. Completing the picture for purposes of this issue, subsection (I)(1) defines the phrase "fees and other expenses" for section 12–348 as including:

> the reasonable *expenses of expert witnesses*, the reasonable cost of any study, analysis, engineering report, test or pro-

---

4. We do note that the tax court's granting of taxpayer's motion to exclude parcel 107A was error. Taxpayer included the parcel in its complaint as one of the 32 parcels that made up the resort, for which it sought a reduction in valuation. Because of the dominance of the income approach in valuing hotel and resort properties, taxpayer's later request to dismiss its action as to parcel 107A did not constitute merely a proposal to reduce the number of parcels for which taxpayer sought a lower value. Instead, it effectively constituted an abandonment of taxpayer's original position that parcel 107A was part of the

resort and that the income it generated was to be taken into account in valuing the resort as a whole.

This change of position amounted to an alteration of the factual basis for taxpayer's claim for relief in the action, and should have been seasonably disclosed to appellants. It is undisputed that it was not disclosed, either in taxpayer's original disclosure or in any supplement or amendment. Taxpayer thereby failed to comply with its disclosure obligations under Ariz. R.Civ.P. 26.1.

ject which is found by the court to be necessary for the preparation of the party's case and reasonable and necessary *attorney fees.*

(Emphasis added.)

We agree with taxpayer that the legislature intended the $20,000 cap imposed on "awards of fees" in subsection (E)(5) to apply only to sums awarded for attorney's fees. In subsection (I)(1), the legislature chose to use the term "fees" only when referring to compensation for attorneys. By contrast, it referred to compensation for expert witnesses as "expenses," and amounts paid for studies or reports as their "cost." In capping "awards of fees" in subsection (E)(5), it is unlikely that the legislature meant for "fees" to have a more inclusive meaning in one subsection of the statute than in the definitional subsection, which by design applies throughout the entirety of the statute. *See State v. Schoner,* 121 Ariz. 528, 530, 591 P.2d 1305, 1307 (App.1979) ("In interpreting a statute, the court should give it a sensible construction which will accomplish legislative intent and purpose."). We therefore hold that the tax court erred to the extent that it found that the $20,000 cap applied to any portion of taxpayer's award other than attorney's fees.

■ Taxpayer's alternative contention is that subsections (B) and (E)(5) permit it to recover separate awards of fees against the state and the county, each subject to a separate $20,000 cap. We disagree. "Statutes should be interpreted according to the fair meaning of their terms and in furtherance of the policies underlying the law." *In re Appeal in Yavapai County Juvenile Action No. J-9403,* 158 Ariz. 356, 358, 762 P.2d 643, 645 (App.1988). The statement of legislative purpose appended to section 12-348 states in section (1)(B) thereof:

The purpose of this section is to reduce the deterrents and the disparity [between citizens and the government] by entitling prevailing parties to recover *an award* of reasonable attorney fees, expert witness fees and other costs against the state.

1981 Ariz.Sess.Laws Ch. 208, § 1 (emphasis added).

■ The clear implication from this statement of purpose is that the legislature contemplated only a single award for a prevailing party. Neither the statement of purpose nor the statute enacted pursuant to it contemplates that a prevailing party could take advantage of the fortuitous circumstance of multiple defendants to receive multiple awards. Subsection (B) must be read to accomplish the legislative purpose of ameliorating the economic distress of litigating tax matters against the government; but it must be read in conjunction with subsection (E)(5) as limiting such amelioration to one award not to exceed $20,000. *State v. Ball,* 157 Ariz. 382, 384, 758 P.2d 653, 655 (App.1988) ("In construing a statute, we look to the statute as a whole and give harmonious effect to all its sections."). We therefore hold that a prevailing party under subsection (B) of section 12-348 is entitled to only one award of attorney's fees and such award may not exceed $20,000.[5]

## CONCLUSION

The judgment is reversed and remanded for proceedings consistent with this opinion. The opinion of the tax court, 178 Ariz. 249, 872 P.2d 204, is vacated.

GERBER and KLEINSCHMIDT, JJ., concur.

---

5. Taxpayer makes one other argument, namely that it was entitled to an unlimited award against the state pursuant to section 12-348(A)(2). However, as we held in *City of Phoenix v. Paper Distributors of Arizona, Inc.,* 186 Ariz. 564, 567–568, 925 P.2d 705, 708–709 (App.1996), section 12-348(A)(2) is inapplicable in tax court matters.