212 P.3d 941

AIDA RENTA TRUST; AKT Joint Venture; Alchemedes Boulder Creek Limited Partnership; Alta Place Arizona Limited Partnership; Alta Vista Apartments; America First Tax Exempt Mortgage Fund 2 L.P.; Amigon Strategic Investments; Anancosta Apartments, Inc.; Anasazi Terrace Condominiums U.S. Limited Partnership; AP Pebble Creek Limited Partnership; Arabian Trails Associates; Arabian Trails Development Partners; Aram II Investment Company; Arboleda Investment L.L.C.; Arthur G. Grandlich; Autumn Creek Property Associates Limited Partnership; AZ Development Partners '87, a Massachusetts Limited Partnership; AZ Development Partners, a Massachusetts Limited Partnership; Barnar Associates; Bertha Z. Pozen; Bethany Apartments Limited Partnership; Bigelow Arizona Casa Carranza Limited Liability Company; Bigelow Arizona Corporation; Bigelow Arizona Limited Liability Company; Bigelow Arizona Limited Liability Company II; Bigelow Arizona Limited Liability Company III; BLM LLC; BRE Properties, Inc.; Bruce J. & Shelagh M. Cann Trust; C & LI, L.C.;

Canbrook Limited Partnership; Casa Bonita Investments Limited Liability Company; Casabella Associates, an Arizona Joint Venture Partnership; Cedar Meadows, Inc.; Christian Relief Services, an Arizona Affordable Housing Corporation; Cigna Income Realty—I Limited Partnership; Cluster Housing Properties, a California Limited Partnership; Concord Equities Limited Liability Company; Contessa Investments Limited Liability Company; Country Villas Limited Partnership; CPW Properties Limited Partnership; Creekwood Summit Lake Limited Partnership; CS Apartments L.L.C.; David A. & Patricia M. Alderdice; Del Mar Terrace Apartments; Desert Pines Investment & Associates; Development Partners II, a Massachusetts Limited Partnership; Dozier, Preissman; El Dorado Arms, Inc.; Empire Partners, L.L.C.; EQR—Arizona, L.L.C.; EQR—Bethany Village Vistas, Inc.; EQR—Camellero Vistas, Inc.; ERP Operating Limited Partnership; Evans Withycombe Finance Partnership, L.P.; Evans Withycombe Residential, L.P.; Farmstead Mesa Property, LP; First Interstate Bank of Arizona Trust; Foothills Shadows Associates Limited Partnership; Frank Lane Italiane; FSA II Hacienda Verde Associates; FSF Quail Point Associates; Gasser Revocable Living Trust & Maxine Gasser Decedent Trust; Gateway Investments Limited Liability Company; Good Fellow, Inc.; H & H Enterprises; H.C. Properties U.S.A., Inc.; H.E. & Loraine Knowles; H. Earle & Loraine Knowles Trust; Hacienda Properties, L.P.; Hamilton Agnew Mather Trust; Hayden Place L.L.C.; HEF Development, Inc.; ITT ML, Inc.; Jacques H. & Frances M. Robinson; James T. Szymanski and Mary Ann Szymanski; James Eugene Albert; James G. Boswell Living Trust; JMB Institutional Apartment Limited Partnership; John & Kay Yee; John Henry & Brigid R. Ragland Co–Trustees of the Ragland Revocable

604

Trust; Josam Investment Company; Joshua Tree, a Washington Limited Partnership; JPI Partners Limited Partnership; La Corrida Apartments, Limited Partnership; La Serena Partners I Limited Partnership; Lakeside Village Apartments L.P.; Lakme Partnership; Las Brisas Associates; Lawrence B. & Geraldine S. Miller; Lincoln Arizona Associates; Lincoln Broadway Village Limited; Los Verdes L.L.C.; Luke Park Development; Luke Park Development Phase II; Magellan Dobson Springs Limited Partnership; Magellan Emparrado Limited Partnership; Magellan Las Palmas Limited Partnership; Marques Properties L.L.C.; Maurice Teitelbaum; Meadow Glen Limited Partnership; Melvyn L. & Laraine S. Marcus; Mesa Hidden Village; Mirada Development Corp.; Mountain Vista Partnership; Norman King Family Trust; Northern Green Associates; Olive Square Limited Partnership; Orangetree, Inc.; Osage L.L.C.; Papago Vista Apartments Limited Partnership; Paradise Trails Associates; Parklane Associates, L.P.; Paul V. and Angeline A. Baker; Pebble Creek/Mesa Limited Liability Company; Peoria Gardens Apartments, Inc.; PGP Arizona, Inc.; Phoenix Crossroads Apartments Limited; Pimesa Property L.P.; Pinnacle Holdings, Inc.; Place II Properties; Presidio Joint Venture; Prime MFP Limited Partnership; Property Trust of America; Quail Holdings, L.L.C.; Residential Property Investors L.P.; Richard B. and Susan M. Darby; Richard N. Mills; Robert S. & Karen Walker Trust/Gerald R. Neva; Ronald Tate Trust; Roscrea Associates Limited Partnership; S W P Properties I Limited Partnership; Salado Springs Association Limited Partnership; Santa Fe & El Segundo; Scottsdale Foothills Limited Partnership; Scottsdale Park Terrace; Security Capital Pacific Trust; Shadow Creek Limited Partnership; Shadow Run Apartments, Inc.; Siegfired C. Ringwald or Mesa Summit Inc.; Sofistar II Limited Partnership; Sun Lakes Marketing Limited Partnership; Sunscape Apartments, a California Limited Partnership; Sunset Shadows Apartments Limited Partnership; Sycamore Properties, L.L.C.; Ted N. Price, Sr.; The Angelo Co.; The Damm Partnership; The Nadler Company; The S Development Company; Theodore T. and Marie Smith; Thunderbird Gardens Resort, L.L.C.; Thunderbird Management Limited Partnership; Toltec Apartments; Towne Center Limited Partnership, a Washington Limited Partnership; Unum Life Insurance Company of America; Vecwest Tatum Limited Partnership; Village at North Park Associates; Villages Apartments Inc.; Vista Del Lagos Joint Venture; Wellsford Residential Property Trust; Westside Apartments Limited Partnership; William A. Mead Trust; YF Partners Eastridge Limited Partners; YF Partners La Estancia Limited Partnership; YF Partners Rancho Sierra Limited Partnership; 324 South Horne Street Associates L.P.; 777 Investments, Inc., Plaintiffs/Appellees–Cross Appellants,

v.

MARICOPA COUNTY, a political subdivision of the State of Arizona; Department of Revenue of the State of Arizona, Defendants/Appellants–Cross Appellees.

No. 1 CA–CV 06–0434.

Court of Appeals of Arizona, Division 1, Department C.

June 11, 2009.

As Amended July 22, 2009.

Mooney, Wright & Moore, P.L.L.C. By Paul J. Mooney, Jim L. Wright, Paul Moore, Phoenix, and Nearhood Law Offices, P.L.C., By Richard D. Nearhood, James R. Nearhood, Scottsdale, Attorneys for Plaintiffs/Appellees/Cross–Appellants.

Helm & Kyle, Ltd. By Roberta S. Livesay, Tempe, Attorneys for Defendant/Appellant/Cross–Appellee Maricopa County.

Terry Goddard, Attorney General By Frank Boucek, III, Assistant Attorney General, Phoenix, Attorneys for Defendant/Appellant/Cross–Appellee Arizona Department of Revenue.

## OPINION

PORTLEY, Judge.

¶ 1 Maricopa County ("County") appeals the summary judgment determination that it had engaged in tax valuation discrimination. The Appellees ("Taxpayers") challenge the trial court's order awarding limited attorneys' fees and costs. For the following reasons, we affirm the trial court's judgment but

1. The legislature consolidated 1995 and 1996 into a single tax period for valuation purposes, although taxes were levied in both years. *See* 1994 Ariz. Sess. Laws, ch. 323, § 49 (2nd Reg. Sess.), *amended by* 1995 Ariz. Sess. Laws, ch.

vacate and remand the costs award for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Taxpayers sued the County for property tax discrimination in violation of the Uniformity Clause of the Arizona Constitution. *See* Ariz. Const. art. 9, § 1 ("[A]ll taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax."). Taxpayers alleged that, for the 1995–1996 tax period,[1] the County discriminatorily valued their apartment buildings at 100% of their full cash value while rolling over valuations on similar properties, which resulted in valuations of less than full cash value.

¶ 3 Taxpayers successfully moved for summary judgment in 1997 because the County had settled similar claims with other taxpayers. We reversed the judgment in part because the County was allowed to settle other tax discrimination suits. *Aida Renta Trust v. Ariz. Dep't of Revenue*, 197 Ariz. 222, 238, ¶ 51, 3 P.3d 1142, 1158 (App.2000). On remand, the trial court again granted Taxpayers summary judgment. We reversed that decision and remanded the matter for a trial in *Aileen H. Char Life Interest v. Maricopa County*, 1 CA–TX 02–0003, 1 CA–TX 02–0013 (consolidated) (Ariz.App. Sept. 2, 2003) (mem. decision).

¶ 4 The parties stipulated to postpone the second remand until after the Arizona Supreme Court acted on our decision. After our decision was vacated in *Aileen H. Char Life Interest v. Maricopa County*, 208 Ariz. 286, 93 P.3d 486 (2004), the Taxpayers again prevailed on summary judgment when the trial court held that the County engaged in deliberate and systematic conduct that resulted in greatly disproportionate tax treatment. The court awarded Taxpayers $1748.90 in costs and $30,000.00 in attorneys'

249, § 36 (1st Reg. Sess.); *see generally Forum Dev., L.C. v. Ariz. Dep't of Revenue*, 192 Ariz. 90, 93–95, 961 P.2d 1038, 1041–43 (App.1997) (discussing the tax valuation and appeal systems for before 1995, 1995–1996, and after 1996).

fees.[2] The County, the Arizona Department of Revenue ("ADOR"), and Taxpayers timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## DISCUSSION

### I. Tax Discrimination

¶5 The County argues that it did not violate the Uniformity Clause when it valued Taxpayers' properties and that summary judgment was inappropriate. We review a summary judgment de novo to determine if there were any genuine issues of material fact and if the trial court correctly applied the law. *Guo v. Maricopa County Med. Ctr.*, 196 Ariz. 11, 15, ¶16, 992 P.2d 11, 15 (App. 1999). We view the facts in the light most favorable to the party against whom summary judgment was entered and may affirm "even if the trial court reached the right result for the wrong reason." *Id.*

■ ¶6 Arizona's Uniformity Clause mandates that "all taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax." Ariz. Const. art. 9, § 1. The Uniformity Clause prohibits discriminatory valuation among "similarly situated properties"[3] causing some properties "to bear a disproportionate share of the property tax burden." *Aileen Char*, 208 Ariz. at 291, ¶9, 93 P.3d at 491. Discriminatory valuation requires proof that (1) taxing officials acted deliberately and

systematically and that (2) their conduct resulted in "greatly disproportionate tax treatment" within a particular class of property. *Id.* at ¶10.

### A. Tax Treatment Applies to the Initial Valuation by the County

■ ¶7 The County contends that tax discrimination only applies to either *final* tax values or taxes actually paid and not to the *initial* values[1] relied upon by Taxpayers.[5] The County relies on *Aileen Char*, which states:

> [I]t is the *tax paid, not the numerical values assigned to property*, that must be uniform. Accordingly, to prevail in a valuation discrimination case, a plaintiff must show tax treatment greatly unequal to that afforded others in the same class and must do so by reference to full cash value.

208 Ariz. at 294, ¶21, 93 P.3d at 494 (emphasis added). As a result, the County argues that tax discrimination "must cause a great tax inequality, not merely a valuation disparity." We disagree.

¶8 No case defines "tax treatment."[6] We do not assume, as the County does, that tax treatment occurs only when a tax bill is sent. Tax treatment must include valuation because *Aileen Char* was a valuation discrimination case looking for "greatly disproportionate valuation." *Id.* *Aileen Char* expressly distinguished discriminatory valuation cases from cases alleging "a dis-

---

2. Taxpayers requested an award of $80,000 for attorneys' fees, $38,865.68 for expert witness expenses, and $2695.35 for taxable costs.

3. The parties agree that the relevant class of properties is multifamily residential properties with more than four units and fewer than four stories high, sometimes referred to as "apartments." These properties are occasionally identified with a property use code ("PUC") of 03xx. *See Aileen Char*, 208 Ariz., at 294, ¶20, 93 P.3d at 494.

4. Initial values, sometimes referred to as "postcard roll values," are the values initially assessed and mailed to taxpayers before the tax rate is set. Taxpayers then have an opportunity to appeal their valuations. The assessor then revalues properties whose values were appealed, and the taxing authority sets the tax rate. *See* A.R.S. § 42–16002 (2006).

5. The County argument is inconsistent. Although it argues that final values are those "upon which the taxes are actually paid," thereby seemingly equating the two concepts, the terms "final tax value" and "taxes paid" are not synonymous.

6. Tax treatment may refer to tax-specific treatment, as opposed to appraisal treatment. The supreme court in *Aileen Char* noted that "[t]he requirement that a taxpayer show greatly unequal treatment reflects the fact that the 'valuation of real property ... is not subject to mathematical certainty' and that the assessment of taxes, therefore, need not be exactly equal." 208 Ariz. at 294 n. 7, ¶21, 93 P.3d at 494 n. 7 (quoting *Bus. Realty of Ariz., Inc. v. Maricopa County*, 181 Ariz. 551, 557, 892 P.2d 1340, 1346 (1995)).

criminatory tax rate or assessment ratio." *Id.* at 291, ¶ 9, 93 P.3d at 491; *see also, e.g., Belas v. Kiga,* 135 Wash.2d 913, 959 P.2d 1037, 1042 (1998) (applying Washington's tax uniformity requirement to valuation and tax rate). Accordingly, Taxpayers need not prove they actually paid disproportionate taxes if they can prove discriminatory valuation.

¶ 9 The County next argues that *Aileen Char* requires evidence based on the final tax rolls that reflect changes from valuation appeals. As a result, the County contends that 1213 properties favorably valued below full cash value must be eliminated from the class-wide analysis because they were independently appealed, thus absolving the County of responsibility for their final values.[7] Similarly, it argues that 727 favorably treated properties' values had to be rolled over pursuant to A.R.S. § 42–247 (1991),[8] again absolving the County of responsibility.

¶ 10 *Aileen Char* seemingly supports the County when it states " '[v]aluation' refers to the *final* value placed upon a piece of property by the taxing authority." 208 Ariz. at 295 n. 8, ¶ 25, 93 P.3d at 495 n. 8 (emphasis added). Nevertheless, the County admits that our supreme court affirmed the finding of tax discrimination in *Aileen Char* using the initial values. The argument that the "ends of justice" demand that we must allow it to change its position on remand to adapt to *Aileen Char* does not assist the County. Regardless of the County's position on the use of initial or final values either now or before our second remand, the Arizona Supreme Court used initial values to reinstate the tax court's finding of tax discrimination. *Id.* at 295–96, 300, ¶¶ 25–27, 50, 93 P.3d at

495–96, 500. Consequently, initial values can be used to demonstrate tax discrimination.

¶ 11 Moreover, there are two practical problems with the County's argument that final tax values are needed to demonstrate tax discrimination. First, final values may be initial values that were resolved through the administrative appeals to the assessor; an officer of the "authority levying the tax." *See* Ariz. Const. art. 12, § 3. Those appeals, however, require evidence from the date of the initial valuation. *See SMP II Ltd. P'ship v. Ariz. Dep't of Revenue,* 188 Ariz. 320, 322, 324, 935 P.2d 898, 900, 902 (App.1996). Accordingly, initial tax values have to be examined for tax discrimination purposes based on the evidence that existed at the initial valuation.

¶ 12 Second, if a taxpayer is unhappy with the administrative appeal, the taxpayer can seek relief on appeal to the State Board of Equalization[9] or the tax court.[10] A taxpayer would need evidence from the initial valuation to challenge the evaluation. Moreover, it would also be difficult to discern the assessor's intent when viewed through the filter of the valuation appeal process, even though values reduced on appeal tend to support an inference that the valuation was discriminatory. Consequently, evidence surrounding the initial valuation is necessary to demonstrate any tax discrimination.

## B. The County Acted Deliberately and Systematically

¶ 13 The County argues that it did not act deliberately and systematically when it valued many of the properties in the favored class because it made a mistake. Tax

---

7. Alternatively, the County argues that 147 of the 228 *plaintiff* properties were taxed on reduced values obtained through administrative or judicial valuation appeals, not due to values set by the County. The County's arguments are not limited to whether its conduct is at issue. It also contends that we should look at post-valuation appeals' final values to determine if a great inequality exists.

8. This section was repealed by Laws 1997, ch. 150, § 9 (effective January 1, 1999).

9. The State Board of Equalization reviews administrative appeals of property tax valuations in

Maricopa County, which does not have a county board of equalization. *See* A.R.S. §§ 42–241 and –221.01(A)(2) (Supp.1998) (renumbered, respectively, as §§ 42–16102 and –16157(A) (2006)).

10. Valuation may also be appealed administratively, but further appeal goes to the State Board of Equalization or the tax court. *See* A.R.S. §§ 42–176, –221(J), and –246 (Supp.1998) (consolidated and renumbered § 42–16056(C) (2006)) (describing alternative administrative and judicial property tax appeal processes).

discrimination requires proof of deliberate and systematic conduct by the County. *Aileen Char*, 208 Ariz. at 291, ¶ 10, 93 P.3d at 491. We examine the plans and practices adopted by the County for systematic and discriminatory conduct. *Aida*, 197 Ariz. at 237, ¶ 50, 3 P.3d at 1157. "[D]eliberate and systematic conduct need not be malicious, only purposeful." *Aileen Char*, 208 Ariz. at 292, ¶ 12, 93 P.3d at 492. Furthermore, "[t]he mere fact that the assessing officials believed their conduct was valid does not render it less vulnerable to attack as discriminatory." *McCluskey v. Sparks (McCluskey I)*, 80 Ariz. 15, 20, 291 P.2d 791, 794 (1955).

¶ 14 We have previously found the "essentially identical factual scenario" of *Aileen Char* to be "analytically indistinguishable" from the present case. The County opines that we have never held it discriminated against the taxpayers. Our previous remands, however, were on different issues. At no point have we ever stated that the County's conduct here was significantly different from its conduct in *Aileen Char*. In fact, our second remand was premised on the similarity of the conduct. *Aileen Char* affirmed the tax court's finding that the County's conduct, essentially the same in both cases, qualified as deliberate and systematic. The only issue *Aileen Char* did not foreclose is whether a great inequality existed because of different properties and different valuations in each case.

¶ 15 The County contends that our comparison with *Aileen Char* occurred before it attempted to introduce newly discovered evidence of a coding mistake in either case.[11] The County introduced the evidence in its Arizona Rule of Civil Procedure 60(c) motion

in *Aileen Char*, 208 Ariz. at 298, ¶ 37, 93 P.3d at 498,[12] and, here, in a motion to modify the joint pretrial statement. The trial court, after ruling on the summary judgment motions, ruled that the County's motion to modify the joint pretrial statement was moot.

▮ ¶ 16 We agree with the trial court. The County cites only our first decision in this case as support for exempting its conduct due to mistake. Our earlier decision stated that conduct challenged under the Uniformity Clause must "result from 'systematic and intentional discrimination' and not merely from random mishap, 'oversight,' 'negligence,' or bungling." *Aida*, 197 Ariz. at 236, ¶ 44, 3 P.3d at 1156. We clarified the statement to mean that the plaintiff had to show some sort of governmental classification, a term that we held included classes created by "differential administrative application of a neutral statute." *Id.* We noted that there had to be evidence of *systematic* conduct, and Taxpayers could not succeed absent evidence they "were denied a benefit routinely granted to others." *Id.* at 238, ¶ 51, 3 P.3d at 1158 (addressing Taxpayers' argument that settling another, factually similar case but refusing to settle this case constituted tax discrimination). Essentially, systematic conduct is present any time a taxing body treats a sub-class of taxpayers differently. *See, e.g., Sparks v. McCluskey (McCluskey II)*, 84 Ariz. 283, 287, 327 P.2d 295, 297 (1958) ("Nor is it a question of mere misjudgment of the assessing officials as to values; it is a question of an intentional overassessment of a portion of a certain class of property in specified areas as compared with assessment of like property in the rest of the county.").[13]

---

11. The County fully admits it favorably valued 333 properties even if all of its other arguments are accepted. The County also admits that another 1212 properties were favored but should not be considered because their valuations were successfully appealed and the final valuations changed. Again, we are concerned with the County's conduct, as opposed to valuation appeals bodies' conduct, and therefore we look at the initial valuation treatment. We do not foreclose the possibility that these 1545 properties alone are sufficient to show systematic conduct.

12. Although the supreme court in *Aileen Char* upheld the trial court's denial of the Rule 60(c)

motion premised on new mistake evidence, 208 Ariz. at 299, ¶ 41, 93 P.3d at 499, Taxpayers incorrectly assert the supreme court agreed that the evidence would not affect the outcome of the case. The supreme court instead noted that the evidence could not be newly discovered because the County had access to it throughout the suit, and it upheld the trial court on that basis. *Id.*

13. Taxpayers argue:

The cause of the decision to code these parcels this way is not at issue in this case. What is at issue is whether the roll-over of these parcels was the result of a deliberate act. Here, even

¶ 17 The County did not merely make an appraisal error; it applied a wholly different valuation procedure to properties within the same class. The County acted purposefully. The multiple incidences reaffirm the belief that they are systematic and intentional. We do not believe repeated taxation conduct is a random mistake.

¶ 18 The County offered the affidavit of Sara Esser, an appraiser employed by the County, to establish the mistake. Taxpayers assert this affidavit is inadmissible because it is incompetent and speculative.

¶ 19 "[E]xpert opinion evidence based on sheer speculation is not competent." *State v. Hollis,* 93 Ariz. 200, 210, 379 P.2d 750, 756 (1963); *see also Badia v. City of Casa Grande,* 195 Ariz. 349, 357, ¶ 29, 988 P.2d 134, 142 (App.1999); *Souza v. Fred Carries Contracts, Inc.,* 191 Ariz. 247, 254, 955 P.2d 3, 10 (App.1997). We will not allow an expert to base a conclusory opinion on no facts. *See Stanley v. Indus. Comm'n,* 75 Ariz. 31, 34, 251 P.2d 638, 639–40 (1952).

¶ 20 Ms. Esser's affidavit stated that she did not know exactly what happened. She bases her conclusions solely on the existence of the incorrect codes, and she admits that she could not find anyone with personal knowledge of the coding. She also admitted that "[w]hat is not known is whether Application Services wrote the wrong code down or assessor personnel told Application Services the wrong code." Although she assumes that one of these two errors was the cause for the disparate treatment, her speculation cannot be used as evidence.

¶ 21 We find, as a result, that there was no genuine issue of material fact regarding the County's intentional and systematic conduct. The County's "mistake" evidence would be insufficient to cause reasonable jurors to come to a different conclusion. Thus, we sustain the summary judgment as to intentional and systematic conduct.[14]

## C. The County's Conduct Caused a Great Inequality

¶ 22 The County next contends that, even if its conduct was deliberate and systematic, there was no resulting great inequality. Taxpayers must prove that deliberate and systematic discriminatory conduct created a great inequality between the values assessed for their properties and for the favored properties. *See Aileen Char,* 208 Ariz. at 296, ¶ 27, 93 P.3d at 496.

¶ 23 The County repeatedly emphasizes that only 1.8% of the class were favored by its conduct. The percentage has no bearing on the great inequality determination. In prior cases, tax discrimination has been proven when as few as one taxpayer was negatively affected. *See, e.g., In re Am. W. Airlines, Inc.,* 179 Ariz. 528, 532, 880 P.2d 1074, 1078 (1994) (invalidating laws that discriminated solely against one airline). Likewise, tax discrimination may exist even though only a small portion of the class is favorably treated. We focus only on its percentage difference of full cash value to determine if a great inequality exists. *See Aileen Char,* 208 Ariz. at 295, ¶ 25, 93 P.3d at 495.

¶ 24 The County further relies on a sales ratio comparison offered to show that the assessed values were accurate and did not create a great inequality. The proffered evidence, however, cannot survive summary judgment. *See Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).

¶ 25 The County compared sales ratio information provided by the Arizona Department of Revenue ("ADOR") with its own ratios for the taxpayers' properties.[15]

---

Ms. Esser admits it was a deliberate act because all of these parcels received a code "540" that caused them to be rolled-over. All Ms. Esser's affidavit asserts is her opinion that the Assessor should not have rolled them over. Taxpayers thus imply that a volitional act is equivalent to a "deliberate" act. We disagree. The supreme court only stated that Taxpayers must show that the County's conduct was "purposeful" not that it was done in bad faith. *Aileen Char,* 208 Ariz. at 292, ¶ 12, 93 P.3d at 492.

14. Because we find this to be a sufficient basis for the summary judgment, we do not address the application of A.R.S. § 42–247 (2006).

15. The sales ratios utilize properties that have been sold during the three previous years and divide their final assessed values by the actual sales values. ADOR's sales ratios used all apartment properties in Maricopa County sold during 1993–1995, although it distinguishes between

ADOR's sales ratios are compiled to determine if final assessed values are uniform, with the ostensible goal of allowing it or boards of equalization to issue an equalization order when substantial disparities exist on a large scale. The problem with the information is that it only examines final values. Because the sales ratio comparison uses final values, not initial values, it is not "evidence from which a reasonable jury could find, directly or by inference, that the probabilities favored the [County]." *Id.*, 166 Ariz. at 310, 802 P.2d at 1009.

¶ 26 The trial court found the existence of a great inequality. The taxpayers' properties were valued at 100% of full cash value, while the favored properties were valued at 56% of full cash value. As a result, the court did not err in finding a great inequality.[16]

## II. Attorneys' Fees and Expert Witness Expenses Under § 12–348

¶ 27 Taxpayers argue that the trial court erred by limiting its award of attorneys' fees, expert witness expenses, and costs. We review the award for abuse of discretion and will reverse if the trial court erred as a matter of law. *Charles I. Friedman, P.C. v. Microsoft Corp.*, 213 Ariz. 344, 350, ¶ 17, 141 P.3d 824, 830 (App.2006).

¶ 28 Taxpayers who are successful in an action challenging their taxes may recover their "fees and other expenses" in addition to recoverable costs. A.R.S. § 12–348(B) (2003). "Fees and other expenses" includes reasonable expert witness expenses and "reasonable and necessary" attorneys' fees. A.R.S. § 12–348(I)(1). Recoverable fees in a tax challenge are limited to $30,000 "for fees incurred at each level of judicial appeal." A.R.S. § 12–348(E)(5).[17] The fees cap, however, applies only to attorneys' fees, not other recoverable expenses. *SMP II Ltd. P'ship*, 188 Ariz. at 327, 935 P.2d at 905.

## A. Expert Witness Expenses

¶ 29 Taxpayers first argue that the trial court misconstrued the $30,000 cap to apply to expert witness expenses as well as attorneys' fees. We clarified in *SMP II* that the fees cap of § 12–348 only limits the recovery of attorneys' fees, not other expenses. 188 Ariz. at 327, 935 P.2d at 905. An award of expert witness fees under § 12–348(B), however, is discretionary, *Cyprus Bagdad Copper Corp. v. Ariz. Dep't of Revenue*, 196 Ariz. 5, 9, ¶ 17, 992 P.2d 5, 9 (App.1999), and Taxpayers do not explain how the trial court abused its discretion. Nothing in the judgment affirmatively states that the trial court would have awarded more expert witness fees if it believed the attorneys' fees cap did not apply. The trial court did not err.

## B. Application of the Attorneys' Fees Cap

¶ 30 Taxpayers next contend they are entitled to recover fees totaling $80,000 because the trial court proceedings on remand are distinct from the original trial court proceeding. The County, in turn, argues that a single cap of $20,000 applies because the lower limit was in effect when this litigation began and all of the trial court proceedings constitute a single "level of judicial appeal." We address the application of the new attorneys' fees cap first.

### 1. Amount of the Attorneys' Fees Cap

¶ 31 Generally, "[n]o statute is retroactive unless expressly declared therein." A.R.S. § 1–244 (2002). There is no declaration of retroactivity for the increased fee limit of § 12–348, in stark contrast to the declaration making § 12–348 applicable to pending cases when it was initially enacted.

---

apartments with twenty-five or more units and those with fewer units. The County's sales ratios used plaintiff properties with twenty-five or more units sold during the same period.

16. Because we find no error in the trial court's judgment, we do not consider Taxpayers' arguments about res judicata, collateral estoppel, or virtual representation.

17. The maximum fee recovery under § 12–348 was raised from $20,000 to $30,000 during the course of this litigation. 2000 Ariz. Sess. Laws, ch. 17, § 1 (2nd Reg. Sess.). Subsection (E) also distinguishes limits on fee awards generally and attorneys' fees awards specifically.

A.R.S. § 12–348 (historical and statutory notes); *see also Marlar v. State*, 136 Ariz. 404, 413 n. *, 666 P.2d 504, 513 n. * (App. 1983) (explaining that § 12–348 was expressly intended to apply to pending cases when first adopted in 1981). A statute applies retroactively, however, "if it is merely procedural and does not affect an earlier established substantive right." *Bouldin v. Turek*, 125 Ariz. 77, 78, 607 P.2d 954, 955 (1979). An allowance for attorneys' fees is a substantive right, *id.*, and therefore the increased cap does not apply retroactively.

■ ¶ 32 Although § 12–348 does not apply retroactively, it does apply to prospectively incurred fees in pending litigation. *See Abril v. Harris*, 157 Ariz. 78, 81, 754 P.2d 1353, 1356 (App.1987) ("The [fees] statute is not applicable to actions taken by him prior to its effective date. However, it does apply to this litigation subsequent to that date."). Here, this means the $20,000 cap applied to fees incurred before the effective date of the increase on July 18, 2000, but the $30,000 cap applies to fees incurred after that date.[18]

### 2. Judicial Levels of Appeal

¶ 33 With the amount of the attorneys' fees cap determined, the next question is how many distinct levels of appeal exist. Taxpayers insist that the trial court proceedings before each subsequent appeal all qualify for separate fee awards. They rely solely on the public policy justification for the fees statute as authority for their interpretation.

■ ¶ 34 We interpret the statute according to its plain meaning because the statutory text is the best evidence of legislative intent. *Ariz. Dep't of Econ. Sec. v. Reinstein*, 214 Ariz. 209, 212, ¶ 9, 150 P.3d 782, 785 (App.2007). The plain meaning of "judicial level of appeal" means the fees cap applies once each to the trial court, court of appeals, and supreme court.[19] *See Arizona Attorneys' Fees Manual* § 4.9 (Bruce E. Meyerson & Patricia K. Norris eds., 4th ed. 2003) ("Presumably, this means that the taxpayer may recover up to $30,000 for attorneys' fees in proceedings before the tax court, the court of appeals, and the supreme court.").

¶ 35 This interpretation is reaffirmed when we examine the history of the present case. It is unlikely that the legislature intended for a taxpayer to recover fees for a portion of the case if unsuccessful at a later stage. *See 4501 Northpoint L.P. v. Maricopa County*, 212 Ariz. 98, 102, ¶ 21, 128 P.3d 215, 219 (2006) (recognizing that a party is not eligible for a fee award under § 12–348 merely because it is successful at an interim stage); *State ex rel. Corbin v. Challenge, Inc.*, 151 Ariz. 20, 28, 725 P.2d 727, 735 (App.1986) (refraining from awarding appellate attorneys' fees pursuant to § 12–348 to parties that successfully obtained reversal of summary judgment until "they ultimately prevail[ed] on the merits"). Moreover, the Arizona Supreme Court has specifically distinguished § 12–348 from § 12–341.01, which allows interim fee awards in certain circumstances. *Northpoint*, 212 Ariz. at 102, ¶¶ 21–22, 128 P.3d at 219. Fee awards are intended to offset the costs of bringing a successful appeal against a governmental body, not to encourage unsuccessful appeals. Thus the plain language of the statute and public policy dictate separate fees limits for the trial court, court of appeals, and supreme court.

18. Taxpayers argue that the Arizona Supreme Court in *Aileen Char* applied the $30,000 cap even though the action was filed when the $20,000 cap was in force. *See Aileen Char*, 208 Ariz. at 299–300, ¶¶ 42–46, 93 P.3d at 499–500. It does not appear, however, that the amount of the applicable cap was at issue before the supreme court. Moreover, the court only awarded fees for the appeal, which was filed in 2001, not for the trial court portion of the case. *See also Abril*, 157 Ariz. at 81, 754 P.2d at 1356 (refusing to retroactively apply A.R.S. § 12–349). Taxpayers further rely on the subsequent fee award granted by the tax court in *Aileen Char* to show that multiple fee awards are permissible for each stage of the appeal, rather than for each court it was argued before. That order, however, is not published and therefore has no precedential value here. *See* ARCAP 28(c); *Walden Books Co. v. Dep't of Revenue*, 198 Ariz. 584, 589, ¶¶ 21–23, 12 P.3d 809, 814 (App.2000).

19. "Judicial" distinguishes actions in court from administrative actions, for which the legislature did not intend to permit the award of fees. *See Maricopa County v. Superior Court*, 170 Ariz. 248, 253, 823 P.2d 696, 701 (App.1991).

**614**

### C. Trial Court Costs

¶ 36 Taxpayers' last argument is that the trial court erred by not awarding them all of their claimed costs. Taxpayers submitted $2,695.35 in costs. *See* A.R.S. §§ 12–332, –341 (2003). The County's objection to Taxpayers' statement of costs was limited to a brief reference to prior costs objections and arguing that the initial fees award was never appealed. The County also attached Judge Mangum's earlier decision limiting costs to the first award amount based on the "law of the case" doctrine.

¶ 37 Section 12–341 mandates an award of all recoverable costs to the "successful party to a civil action." *Roddy v. County of Maricopa*, 184 Ariz. 625, 627, 911 P.2d 631, 633 (App.1996) (quoting A.R.S. § 12–341). Taxpayers opine that the trial court agreed with the "law of the case" argument when it limited the costs. The County claims costs were limited due to its original objections; however the original objections pertained to costs not included on Taxpayers' most recent statement of costs. We assume then that the trial court relied on the "law of the case" argument.

■ ¶ 38 The "law of the case" doctrine does not apply to the original trial court costs award. The law of the case makes a decision controlling on the same court or a lower court throughout subsequent stages of trial as long as the evidence and issues do not change. *Ctr. Bay Gardens, L.L.C. v. City of Tempe City Council*, 214 Ariz. 353, 356, ¶ 17, 153 P.3d 374, 377 (App.2007); *Kadish v. Ariz. State Land Dep't*, 177 Ariz. 322, 327, 868 P.2d 335, 340 (App.1993).

■ ¶ 39 The original costs award pertained to a summary judgment we subsequently reversed. The costs award ceased to exist at that point. Subsequently, the issues of the case changed. Moreover, any increase in statutorily taxable fees constitutes a change of evidence concerning a costs award. Taxpayers' otherwise uncontested statement of costs showed increased amounts for court filing fees and service of documents. Considering the extended litigation that has occurred since the first statement of costs was filed, the increased costs may be valid. We vacate the costs award and remand so that the trial court may consider all taxable statutory costs incurred since the action was filed and before the trial court's decision was final.

### III. Attorneys' Fees on Appeal

¶ 40 Taxpayers request attorneys' fees and costs on appeal pursuant to A.R.S. §§ 12–348(B) and –349. We award their fees on appeal not exceeding $30,000, pursuant to § 12–348(B) and (E)(5), and costs upon compliance with Arizona Rule of Civil Appellate Procedure 21(c). We do not find the County's positions on appeal unreasonable and therefore do not award additional fees pursuant to § 12–349.

### CONCLUSION

¶ 41 For the foregoing reasons, we affirm in part and vacate and remand in part for reconsideration of the costs award.

CONCURRING: DANIEL A. BARKER and JOHN C. GEMMILL, Judges.